CONTINENTAL AIR LINES,
INC., Petitioner,

v.

CIVIL AERONAUTICS BOARD,
Respondent,

American Airlines, Inc., et
al., Intervenors.

CONTINENTAL AIR LINES,
INC., Petitioner,

v.

CIVIL AERONAUTICS BOARD,
Respondent,

American Airlines, Inc., et
al., Intervenors.

Nos. 73–1714, 73–1718.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 5, 1974.

Decided Nov. 7, 1974.

Order Jan. 21, 1975.

Reargued April 2, 1975.

On Rehearing En Banc Oct. 14, 1975.

108

Thomas D. Finney, Jr., Washington, D.C., with whom Lee M. Hydeman and James T. Lloyd, Washington, D.C., were on the brief, for petitioner.

Alan R. Demby, Atty., C. A. B. with whom Richard Littell, Gen. Counsel, O. D. Ozment, Deputy Gen. Counsel, Glen M. Bendixsen, Associate Gen. Counsel and Robert L. Toomey, Atty., C. A. B., were on the brief, for respondent.

Carl D. Lawson, Atty., Dept. of Justice, with whom Bruce B. Wilson, Acting Asst. Atty. Gen., Robert B. Nicholson, Atty., Dept. of Justice, was on the brief, for intervenor United States.

Edmund E. Harvey, Washington, D.C., for intervenor Trans. World Airlines, Inc.

Alfred V. J. Prather and J. William Doolittle, Washington, D.C., were on the brief for intervenor American Airlines, Inc.

Henry L. Hill, Chicago, Ill., was on the brief for intervenor United Air Lines, Inc., J. Stanley Stroud, Chicago, Ill., also entered an appearance for intervenor United Air Lines, Inc. in No. 73–1718. Frank P. Cihlar, Washington, D.C., also entered an appearance for intervenor United Air Lines, Inc., in No. 73–1714.

James W. Callison, Atlanta, Ga., was on the brief for intervenor, Delta Air Lines, Inc. Robert Reed Gray, Washington, D.C., also entered an appearance for intervenor, Delta Airlines, Inc.

Before WRIGHT, TAMM and WILKEY, Circuit Judges.

TAMM, Circuit Judge:

In this consolidated appeal, petitioner Continental Air Lines, Inc. (hereinafter "Continental"), joined in several of its arguments by the Department of Justice as intervenor, challenges four administrative orders of the Civil Aeronautics Board (hereinafter "the Board") which established and implemented a Board

policy concerning standards for commercial airplane seat configurations. Several airlines [1] have also intervened, basically urging us to uphold the Board's orders. However, for the reasons stated below, we must set aside the Board's orders and remand for further proceedings.

I

This case is an outgrowth of the Board's extensive Domestic Passenger Fare Investigation which was initiated in January, 1970.[2] Its purpose was "to set ratemaking standards with respect to the various elements underlying both fare level and fare structure . . . ." CAB Order 70-1-147 (Jan. 29, 1970), J.A. I. 40. On February 26, 1970, the Board divided the investigation into nine phases, Phase 6 of which was designated "Load Factor and Seating Configurations." [3]

Hearings on Phase 6 were initially held before an Administrative Law Judge, in August 1970. On November 19, 1970, the Board divided Phase 6 into two subphases, and, at the `request of American Airlines, Inc., (hereinafter "American") ordered the record on the seating configuration issues (designated Phase 6A) certified directly to the Board.

CAB Order 70-11-91 (Nov. 19, 1970), J.A. I. 55.

At that point in the proceedings, the major seating configuration issue was the use of five-abreast seating in the coach sections of narrow-bodied jets.[4] Petitioner Continental, alone among the major carriers, had been offering such a service since 1964 with Board approval. However, the Board, noting a dilemma based on the "recent movement of some trunk carriers to five-abreast seating," [5] concluded that rapid execution of the Board's ratemaking functions necessitated certification of the Phase 6A record.

Most of the trunk lines supported the adoption of mandatory fare differentials for varying seating configurations. They argued that the Board has the power to adopt such standards as an adjunct to its statutory ratemaking authority and urged the Board to act to prevent a competitive "seat war" which would ultimately degrade the economics of coach operations. CAB Order 71-4-48 (Apr. 8, 1971), J.A. I. 76-77. Other carriers, most notably Continental, and the Department of Transportation opposed the adoption of mandatory fare differentials based upon seating accommodations. While endorsing the utilization of seating standards for Phase 7 fare level purposes, they argued that the

---

1. American Airlines, Inc., Delta Air Lines, Inc., Trans World Airlines, Inc., and United Air Lines, Inc., have all intervened.

2. The Investigation was ordered on January 29, 1970. *See* CAB Order 70-1-147 (Jan. 29, 1970), Joint Appendix vol. I. 39 (hereinafter J.A. I.). It was instituted as a result of persistent requests by the Honorable John E. Moss and other members of Congress.

3. CAB Order 70-2-121 (Feb. 26, 1970), J.A. I. 48. The nine phases are:
 1. Aircraft Depreciation
 2. Leased Aircraft
 3. Deferred Federal Income Taxes
 4. Joint Fares
 5. Discount Fares
 6. Load Factor and Seating Configurations
 7. Fare Levels
 8. Rate of Return
 9. Fare Structure

4. Narrow-bodied aircraft, primarily the Boeing 707 and 727, have been designed to accommodate a maximum of six seats across, which at that time was the dominant coach class configuration.

5. United and American had filed tariffs for five-abreast seating. The Board reasoned:
 The recent movement of some trunk carriers to five-abreast seating for coach and economy service presents a serious dilemma to those carriers now offering six-abreast seating for such services: either they must continue to offer six-abreast seating, thereby placing themselves at a substantial competitive disadvantage to the other carriers, or they must undertake substantial expenditures for the installation of five-abreast seating, thereby assuming the risk that such seating standards may not conform to the standards ultimately adopted by the Board. CAB Order 70-11-91 (Nov. 19, 1970), J.A. I. 56 (footnote omitted).

Board lacked authority to establish fare differentials, citing the prohibition of section 401(e)(4) of the Federal Aviation Act of 1958, 49 U.S.C. §§ 1301–1542 (1970) (hereinafter "the Act") against certificate limitations on carrier accommodations. *Id.*, J.A. I. 77–78.

On April 8, 1971, the Board announced a "tentative" order in the Phase 6A proceeding, which was founded on the premise that:

Air carriers, in providing scheduled passenger service for the public, are dealing with the sale of a product; this product is essentially space in an aircraft. In any particular aircraft there is a limited amount of space available for passenger services. Since this space is divided into units for sale to the public, the larger each unit, the fewer units a carrier will have available to sell, the fewer the number of passengers a carrier can accommodate and the fewer the number of units over which a carrier can recover its cost.

*Id.*, J.A. I. 83. The Board concluded that sections 102(c), 1002(d), and 1002(e) of the Act enabled it to prescribe fare differentials for different seating configurations and rejected arguments that section 401(e)(4) proscribed such action, asserting that section 401(e)(4) "does not in any way restrict the Board's clear powers under section 1002 of the Act to regulate fares in relation to the nature of the services provided." *Id.*, J.A. I. 85.

The Board reached the tentative conclusion that the standard for coach-class fares in narrow-bodied jets should be six seats abreast and imposed a 8.5 per cent surcharge on five-abreast seating. The Board felt that

failure to differentiate the 5-abreast and 6-abreast services for fare purposes will inevitably lead to the erosion of 6-abreast seating as competition forces more and more carriers to convert to the more commodious and attractive 5-abreast configuration.

*Id.*, J.A. I. 87.

The Board next turned to the question of wide-bodied jets—DC–10's and L–1011's designed for nine-abreast seating and B–747's designed for ten-abreast. While choosing not to impose a surcharge on aircraft configured at eight- and nine-abreast seating, which utilize a seat of the same width as the five-abreast seat in the narrow-bodied jets, the Board recognized a "dilemma" on this question, but argued that all the carriers had already adopted the more spacious configuration and that in light of the then-current low load factors on wide-bodied jets, there was little need for denser seating. *Id.*, J.A. I. 108–09.

The Board also took note of another new development in coach configuration—the installation of complimentary coach lounges in wide-bodied jets, recently initiated by American Airlines. CAB Order 71–3–80 (Mar. 12, 1971), J.A. I. 61. While the Board expressed concern over the long-term economic implications of this practice, it deferred any "definite conclusions" regarding the need for configuration standards and mandatory fare differentials for lounge services at that time. CAB Order 71–4–48, *supra*, J.A. I. 109.

Board Member Murphy dissented, finding the standards "an unlawful, unwarranted exercise of our ratemaking power" and "ill-advised interference with the managerial discretion of all the airlines." *Id.*, J.A. I. 117. He thought that the threat of excessive variations of seating density did not exist. Member Murphy pointed to the newly developed "Two-plus-Two" seating arrangement[6] as a more likely alternative to five-abreast seating and recognized that a more spacious configuration could only prove uneconomical when coupled with high load factors, which had not existed in the industry in recent years. He also believed that the imposition of seating standards would violate the prohibition of section 401(e)(4). *Id.*, J.A. I. 130–31.

Exceptions to the tentative decision were filed on April 22, 1971, by nearly

**6.** This is a variation of six-abreast seating where the middle seat of each row of three seats on either side of the aisle folds down into a table leaving four seats across.

all parties involved, including, for the first time, the Department of Justice. On June 29, 1971, the Board ordered the record reopened to consider three industry developments which had occurred during the preceding year: (1) the impact of Two-plus-Two seating in narrow-bodied jets and its effect on the ability of six-abreast seating to compete with five-abreast seating; (2) the experience of the first full year of use of wide-bodied jets and its impact on configuration standards for those planes; and (3) new evidence on coach lounges in wide-bodied jets in light of their increased utilization by several carriers. CAB Order 71–6–147 (June 29, 1971), J.A. I. 61–63. The Board again found it necessary to proceed to an expedited decision, after hearings before an Administrative Law Judge, but before a decision on his part.

During those hearings, evidence indicated that there had been no stampede by the airlines to install five-abreast seating and that Two-plus-Two seating could compete effectively with five-abreast configurations. Market surveys indicated that the public preferred wide-bodied jets to narrow-bodied aircraft at standard seating and that the public would not pay a 8.5 percent surcharge for more comfortable seating. As for coach lounges, American and United Air Lines (hereinafter "United"), two major lounge operators, argued against the adoption of a surcharge and noted that most lounge seats were for sale. *See* J.A. IV. 1052–A, 1056, 1072–A, 1099–1100. Trans World Airlines, Inc. (hereinafter "TWA"), joined by most non-lounge operators, argued in favor of a surcharge and foresaw another "domino-impact" in which the lounge would proliferate throughout the industry.

On May 26, 1972, the Board entered its Phase 6A decision, the first order under challenge here. CAB Order 72–5–101 (May 26, 1972), J.A. I. 252. By a 3–2 vote the Board adopted configuration standards for determining overall fare level, including, *inter alia* : (1) six-abreast seating for narrow-bodied jets; (2) eight and nine-abreast seating until

January 1, 1975 and nine- and ten-abreast thereafter for wide-bodied jets; and (3) a loungeless configuration for both types of aircraft. *Id.*, J.A. I. 258–59.

The Board admitted that the forecasted proliferation of five-abreast seating had not occurred, primarily because six-abreast seating designed with a Two-plus-Two configuration could compete effectively with five-abreast seating. Consequently, the Board decided not to impose a surcharge for five-abreast seating after all, and concluded that "[i]f the carrier believes that it can profitably operate 5-abreast services at a fare level computed on the basis of 6 seats abreast, it is free to do so." *Id.*, J.A. I. 279.

While predicting that there was "no reason to believe" that six-abreast seating would not continue to remain competitive with five-abreast, the Board, however, recognized "the possibility that an adverse competitive impact could develop in the future, particularly if additional carriers should choose to convert portions of their fleet to 5-abreast seating and vigorously promote the more luxurious service." Consequently, the Board announced that if a carrier could demonstrate an "adverse competitive impact by 5-abreast services," it could then file a lower tariff. Moreover, the more spacious carrier could only match the reduced fare upon a showing of "special or unusual circumstances." *Id.*, J.A.I. 280.

Focusing on wide-bodied aircraft, the Board recognized that the "statutory policy of favoring low-cost transportation" logically dictated the adoption of the more dense ten- or nine-abreast configurations. However, since all domestic carriers were operating aircraft at a more spacious configuration, the Board found it "unreasonable" to demand the carriers to convert at that time. Instead, a January 1, 1975 date was fixed for fare level purposes. *Id.*, J.A. I. 283.

Finding that the introduction of the lounge was not unreasonable in view of the fact that the wide-bodied jets had limited initial public acceptance and were operating with low load levels, the

Board refused to impose a surcharge for lounge services. It then concluded that

As long as the fare level is based upon loungeless configurations so that the normal fare level is not burdened by this higher cost service, we would allow the carriers a reasonable degree of flexibility to deal with short-term problems of excess capacity.

*Id.*, J.A. I. 287. The Board, however, also announced that consistent with its five-abreast standards, a loungeless operator could lower its fare upon a showing of an adverse competitive impact. *Id.*, J.A. I. 287 n.40. The Board announced its expectation that the carriers would "discontinue the service when it no longer serves a valid purpose" and would do so shortly. *Id.*, J.A. I. 288.

Vice Chairman Gulilland dissented in part, finding the "special or unusual circumstances" test an unjustified, arbitrary, and stringent rule. Board Member Murphy found that the adoption of the standards created a "predetermined result" of future surcharges. In light of the competitive viability of Two-plus-Two seating, he foresaw no necessity for the standards the Board established, especially since the use of seating standards for fare level purposes would discourage undue movement to five-abreast seating.

Virtually all parties involved filed petitions for reconsideration. During the pendency of those petitions, several important events transpired. Delta Air Lines (hereinafter "Delta") filed a tariff to reduce its fare between Dallas and California by 15 per cent for loungeless service in wide-bodied jets. American and Continental opposed the tariff, and on July 28, 1972, the Board rejected Delta's tariff, finding inadequate justification. CAB Order 72–7–97 (July 28, 1972), J.A. I. 302. Delta refiled its proposed rate reduction, and the Board on November 10, 1972 again found the reduction "not warranted." CAB Order 72–11–30 (Nov. 19, 1972), J.A. I. 306.

TWA next proposed to reduce its New York-Los Angeles fare by $10 for a loungeless configuration. TWA claimed that the basic purpose of the filing was to assist in moving the industry out of the economic dilemma which the proliferation of coach lounges had created. The airline pointed to its experience when American introduced the first coach lounge and, with the added advantage of lead time, increased its market share from 38 to 46 per cent within three months. TWA indicated that the filing was solely instituted as a means to eliminate lounge competition and that it would withdraw the fare if the Board permitted a lounge operator to match it. TWA Justification, J.A. III. 849–50.

On January 23, 1973, the Board permitted TWA's reduced fare to become effective. The Board admittedly had difficulty finding that TWA had met its burden of demonstrating an adverse competitive impact, as required by the Board's Phase 6A decision, yet nevertheless authorized the tariff by concluding that "unless a differential is allowed, the risk of adverse competitive impact is sufficient to inhibit elimination of the lounge by individual carriers." CAB Order 73–1–69 (Jan. 23, 1969), J.A. I. 319.

The Board went on to state:

TWA's proposal appears to be a reasonable attempt to eliminate an unnecessary frill, to which the competing carriers have a variety of alternative responses available. It is not possible to foretell at this time what the impact may ultimately be on the ability or willingness of the industry to discontinue coach lounge service. If carriers providing lounge service conclude that operations with a price differential are feasible there would, of course, be no basis for concern on their part. If, on the other hand, these carriers conclude that they must be competitive on price, they are free to discontinue lounge services. In that event, the necessity for a fare reduction would be eliminated and the present fare, which is based upon the cost of operations without a lounge, would likely continue.

*Id.*, J.A. I. 319. Apparently, the reduced fare never went into effect; TWA and its competitors entered into what the Board later described as a mutually acceptable program of lounge removal. CAB Order 73–6–4 (June 1, 1973), J.A. I. 323.

Thus, in the spring of 1973, petitioner Continental was operating wide-bodied aircraft with coach lounges in the Chicago-Los Angeles market while its competitors were in the process of removing their lounges. *See* American's Br. at 7. On April 18, 1973 United filed a $10 fare reduction in that market for non-lounge wide-bodied service. United, in its statement of justification, pointed to the TWA Los Angeles-New York case and the Board's Phase 6A decision, but did not even allege the "adverse competitive impact" standard set out in the latter. United Tariff Justification (Apr. 18, 1973), J.A. III. 887–89. In fact, United stated that its "filing has the same goal as the TWA filing and provides the same variety of alternative responses as did the TWA proposal." *Id.*, J.A. III. 888. American, TWA and Continental all filed matching fares; however, Continental's fare retained the lounge service. On June 1, 1973, the Board issued an order, challenged here in No. 73–1714, which allowed United's fare to go into effect while suspending and ordering an investigation of Continental's matching tariff. CAB Order 73–6–4 (June 1, 1973), J.A. I. 321. The Board labelled the lounge an "unnecessary frill" and asserted that non-lounge operators "would not have a reasonable opportunity to remain competitive with a lounge operator absent some price advantage . . . ." *Id.*, J.A. I. 325. The Board found the $10 reduction to be reasonably related to the fully allocated cost of the lounge service. *Id.* Member Murphy again dissented,

noting that "United's tariff is not really meant to benefit the public. It is intended only as a tool to pressure Continental into eliminating its lounges." *Id.*, J.A. I. 327 (Member Murphy dissenting).

On June 6, 1973, Continental filed a petition for reconsideration together with a motion to stay the Board's order. On June 26, 1973, Continental filed a motion to stay with this court.

On that same day, the Board issued its opinion on reconsideration. The Board again tightened its standard as to when a six-abreast carrier could reduce its fare to meet five-abreast competition. Such carriers would now have to demonstrate "actual harm." CAB Order 73–6–102 (June 26, 1973), J.A. I. 348. The Board also modified its standard as to coach lounges. It would permit carriers to reduce fares for loungeless service if it "appears that the risk of adverse competitive impact would otherwise inhibit such conversion . . . ." *Id.*, J.A. I. 360–61. The Board found that "the incentives established by the final decision in this area are not sufficient to encourage carriers to convert . . . ." *Id.*, J.A. I. 360. Member Murphy again dissented.

On July 3rd the Board, although agreeing to investigate United's tariff, denied Continental's pending motions for stay and reconsideration based upon its June 26th Order. CAB Order 73–7–6 (July 3, 1973), J.A. I. 367.[7] On August 1, 1973, this court stayed the Board's suspension order and consolidated the petitions for review. The petition for review in No. 73–1714 challenges both the suspension order and its order on reconsideration. The petition in No. 73–1718 challenges both the Board's final order in its Phase 6A Investigation and its Order on Reconsideration.

---

7. Pursuant to this investigation, an Administrative Law Judge issued a decision on December 21, 1973 which found the fare reasonably related to loungeless service between Los Angeles and Chicago to be $7 less, not $10 less than coach lounge service. The Judge found Continental's matching fare to be unjust, unreasonable, and unlawful. Chicago-Los Ange-

les Fare Reductions Case, Initial Decision (CAB, Dec. 21, 1973), J.A. IV. 997. On October 8, 1974, the Board basically upheld the Administrative Law Judge's decision with the modification that the fare differential be reduced to $5. Chicago-Los Angeles Fare Reductions Case, Order 74–10–27 (CAB, Oct. 8, 1974).

Petitioner Continental asserts that the Board's Phase 6A ruling (1) is vague; (2) establishes internally inconsistent standards; (3) creates standards on the basis of findings which are not based on substantial evidence; (4) was erroneously promulgated since the Board bypassed the Administrative Law Judge when it had no authority to do so; (5) establishes standards beyond the statutory ratemaking criteria; and (6) implements standards which are prohibited by section 401(e)(4) of the Act. The Department of Justice, although employing a slightly different argument, joins Continental on this last point. Both argue that the application of the Phase 6A Order in the Chicago-Los Angeles case must, consequently, be set aside. Before turning to the merits of these contentions, it would be helpful to review the Board's statutory powers and limitations in this area.

## II

The Board, in its Tentative Order for the Phase 6A Investigation, asserted that its power to establish fare differentials for different seating configurations derived from sections 102(c), 1002(d), and 1002(e) of the Federal Aviation Act. CAB Order 71–4–48 (Apr. 8, 1971), J.A. I. 83–84. Section 102(c) charges the Board, while performing its statutory functions, to consider as being in the public interest

> The promotion of adequate, economical, and efficient service by air carriers at reasonable charges, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices;

49 U.S.C. § 1302(c) (1970). Section 1002(d) gives the Board power to prescribe air carrier rates. Section 1002(e), the Rule of Rate Making section, establishes the criteria that the Board must apply. Subsection (2), which the Board

relies upon here, mandates that the Board consider

> The need in the public interest of adequate and efficient transportation of persons and property by air carriers at the lowest cost consistent with the furnishing of such service;

49 U.S.C. § 1482(e)(2) (1970).

These statutory sections do appear to authorize in theory the Board to consider accommodation standards when passing upon the reasonableness of charges and the adequacy of service consistent with cost. On the other hand, these sections were not the only statutory instructions given to the Board by Congress. The Board, while performing its duties, must consider "[c]ompetition to the extent necessary to assure the sound development of an air-transportation system . . . ." 49 U.S.C. § 1302(d). In its rule of ratemaking, it is also required to consider "[t]he need of each air carrier for revenue sufficient to enable such air carrier, under honest, economical, and efficient management, to provide adequate and efficient air carrier service." 49 U.S.C. § 1482(e)(5) (1970).

 Moreover section 401(e)(4)[8] prohibits the Board from directly regulating carrier accommodations and conditions. Its purpose apparently is to retain for the air carriers the traditional entrepreneurial freedoms in this area. While the subsection itself deals only with limitations on certificates, we believe that it has relevance to the Board's actions here. The Board cannot frustrate the Congressional purpose behind section 401(e)(4) by indirectly regulating accommodations through other actions when it cannot do so directly. As the Board itself conceded

> the Board could not by the use of arbitrary fare differentials, unrelated to

---

**8.** No term, condition, or limitation of a certificate shall restrict the right of an air carrier to add to or change schedules, equipment, accommodations, and facilities for performing the authorized transportation and service

as the development of the business and demands of the public shall require; . . .
49 U.S.C. § 1371(e)(4) (1970).

valid rate-making considerations, render the furnishing of particular types of services prohibitive. Such action could well be regarded as an attempt to do by indirection what the Board is prohibited from doing under section 401(e)(4), and in any event would not be justified under the standards of section 1002(e).

CAB Order 71–4–48 (Apr. 8, 1971), J.A. I. 85 n.13.

■ In setting out the statutory framework within which the Board must operate, we recognize that no one section is an absolute restriction on actions the Board may take to further other statutory goals. As we recognized when addressing section 401(e)(4) in *Capital Airlines, Inc. v. CAB* : "That provision must be read in harmony with the rest of the Act." 108 U.S.App.D.C. 215, 281 F.2d 48, 52 (1960).

■ We are, of course, mindful of the deference to be afforded the Board's accumulated experience and discretion in carrying out its Congressionally-mandated duties. However, our reviewing function requires us to ensure that the Board follows the statutorily-required ratemaking criteria and does not violate the statutory limitations on its discretion. In *Capital Airlines* we refused to uphold an interpretation of section 401(e)(4) which would have "emasculated" another section of the Act. *Id.* In performing our reviewing function, we must ensure that neither the Board nor the parties emasculate any part of the Act, including the underlying purpose of section 401(e)(4) to give the carriers flexibility to engage in service competition. With this in mind, we turn to the Board's Phase 6A Orders.

### III

The Board argues at the outset that the petition to review in No. 73–1718 should be dismissed on ripeness grounds, since the announced standards are merely expressions of policy. *See* CAB's Br. at 33. However, the Board has already begun implementing this "policy expression" in the New York-Los Angeles cases and in the Chicago-Los Angeles tariff. Moreover, we recently reviewed the Board's "policy pronouncement" in Phase 4 of this same investigation in *American Airlines, Inc. v. CAB*, 161 U.S.App.D.C. 430, 495 F.2d 1010 (1974). We see no reason to postpone consideration of the Board's order on ripeness grounds.

The Board bases its fare differential standards on one major economic premise—the fewer the seats in the airplane, the more expensive the ride for each passenger. In light of several factors, however, the premise and its implementation by the Board appear highly arbitrary. First, there appears to be no record evidence that demonstrates the validity of this assumption at low load levels. The Board's rationale is that the less dense seating configuration and the coach lounges displace fare-paying customers, which forces existing passengers to pay a higher share of the costs. However, that conclusion does not follow if those customers theoretically turned away never existed to begin with. Moreover, the record indicates that Continental, the carrier which utilized the less dense five-abreast seating, traditionally has had low load factors and that all the carriers opted for more spacious configurations in wide-bodied aircraft because of their limited initial public acceptance and the accompanying low load factors. If this is the case, the existing passengers would not bear any additional cost because of the more commodious accommodations and would receive the benefits of these services.

The Board's hypothesis may not even hold true at high load factors. Continental and the Department of Justice contend that at high load levels, economics and sound management would dictate that the carriers convert to a denser seating configuration to receive the maximum advantage of the greater demand. We have searched the record, but have not found evidence to support the conclusion that this would not happen absent the Board's rate differential incentives. The Board, in justifying the need

for its standards, points to the rise in load-levels in several major markets by early 1973. CAB's Br. at 49. As the Board admits, however, the increase involved was primarily generated by Capacity Limitation Agreements between the carriers. Since these agreements were consummated during a period when the carriers were awaiting configuration standards to emerge from the Phase 6A Investigation, there is no indication that management would not have removed the lounges of their own accord because of increased capacity.

Moreover, the arbitrary and capricious nature of the Board's action is demonstrated by its selective myopia in confronting the problems of economy and competition. While claiming that the most efficient use of aircraft space was vital to passenger costs and carrier revenue, it postponed forcing the carriers to use the most dense configuration for wide-bodied jets for fare level calculations until 1975. Its rationale was that all carriers, including the Big Three, were then utilizing a more spacious configuration on their wide-bodied aircraft. However, Continental's six-year use of five-abreast seating for narrow-bodied jets received no consideration. Furthermore, the Board, while creating a fare differential for carriers using six-abreast service which faced adverse competition because of the more spacious seating of a five-abreast carrier, gave no thought to potential competition between narrow- and wide-bodied aircraft. We find this somewhat surprising since such competition obviously exists and since the wide-bodied aircraft were using the same spacious seats that the Board found so competitively dangerous when fastened to a 707.

Finally, the Board in its Phase 6A orders established seating configuration standards for fare level purposes. These standards include the denser six-abreast seating for narrow-bodied jets and a loungeless configuration for all planes. As the Board argues, these "standards for rate-level purposes [preclude] a carrier from passing on to the traveler the

higher costs associated with unnecessarily luxurious service." CAB's Br. at 41.

Continental, the Department of Justice, and the dissenting member of the Board all subscribe to the wisdom of setting fare level standards. However, they argue that since a carrier wishing to employ a more commodious arrangement must do so at its own risk, the Board has failed to demonstrate why fare differential standards are required to promote the statutory goals of the public interest in "adequate and efficient transportation," the promotion of economic service, or the need of each carrier for sufficient revenue. See 49 U.S.C. §§ 1302(c), 1482(e)(2), (5) (1970). Instead, the Board has failed to preserve service competition and has infringed upon management's control over accommodations in violation of section 401(e)(4).

We find these arguments persuasive. The Board's actions appear arbitrary and capricious and represent a clear error of judgment. 5 U.S.C. § 706(2)(A) (1970); See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). It has failed to accommodate adequately the policies mandated by Congress, has infringed on the carriers' ability to compete through service competition which is protected by section 401(e)(4) of the Act, and has opted to eliminate, instead of encourage, competition as it is statutorily required to do, without demonstrating how its actions are dictated by economies or the public interest.

We also take issue with the Board's delay until 1975 in implementing its configuration standards for wide-bodied jets. The Board based its postponement primarily on the fact that all carriers presently had a more spacious configuration employed. See CAB Order 73–6–102, supra, J.A. I. 354–55. However, in light of the Board's own announced fare level policy and the clear mandate of the statute that the Board protect the public interest and provide for transpor-

118

tation at the lowest cost, we do not see how the Board can use industry practice here as a valid criterion for establishing ratemaking policies. *See* 49 U.S.C. §§ 1302(c), 1482(e)(2) (1970).

## IV

Both the wisdom of Congress in reserving the question of aircraft accommodations to the individual carriers and the questionable judgment of the Board in attempting to curtail seating competition between carriers are well illustrated by the prior history of seating innovations in the industry. Continental inaugurated five-abreast seating with Board approval in 1964. At that time, the Board held that Continental was free to offer this added service benefit since it could afford to do so. *See* CAB Order E–20381, 39 C.A.B. 875 (1964). For six years, no other carrier felt the necessity of matching Continental's seating plan. In fact, at the time of the Board's tentative order for Phase 6A, only United, on one series of narrow-bodied jets, and Northwest Airlines, for a one year period utilizing and aircraft model it was phasing out of its fleet, had employed any five-abreast seating. *See* Continental's Br. at 7 n.13; J.A. IV. 1137. However, the Big Three raised the specter of a domino-type series of conversions to five-abreast seating, so the Board announced an 8.5 per cent surcharge in its tentative order.

What actually happened in the industry was completely different. Instead of an industry-wide stampede to five-abreast configurations, the major carriers, including American and TWA, introduced the innovative Two-plus-Two seating. This configuration successfully competed with five-abreast seating and even involved a lower conversion cost. CAB Order 72–5–101 (May 26, 1972), J.A. I. 274–76. Moreover, Two-plus-Two seating did not reduce the aircraft's capacity since the middle seat, if needed, could still be utilized. The Board, there-

fore, finally opted against a surcharge for five-abreast seating.

Consequently, not only had the competition generated by Continental's original innovation benefitted the traveling public by offering more spacious accommodations at no extra cost, but it sparked a subsequent innovation which offered the public similar luxury while protecting the airline's ultimate capacity.[9] It is quite conceivable that if there had not been five-abreast seating, Two-plus-Two would never have been invented.

A similar history might have emerged from the carriers' experience with coach lounges except for the Board's interference. The first wide-bodied coach lounge was introduced by American Airlines. At the time, load factors were low, but American was able to boost its market share with its novel innovation. As the airlines had little to lose by making the conversion, other carriers introduced their own lounges. Recently, however, because of carrier reduction agreements generated partially by the fuel shortage, load factors have risen. Some airlines by that time had begun mutually acceptable lounge removal programs.

However, at this point, the Board, declaring war on "needless frills", offered a fare differential if the carriers could demonstrate they were inhibited from removing their lounges by the "risk of adverse competitive impact." Happy that the Board would run interference for them, the Big Three suspended all removal plans until the resolution of the Board's authority to provide them with the competitive advantage of a fare differential.

We do not see where the Board found the need to interfere with the protected forces of competition. Some lounge removal had begun. Despite some apparent representations to the contrary by the Board and Intervenors at oral argument, the record clearly shows that most lounge seats could be sold. *See, e. g.,*

---

9. In fact, petitioner admitted at oral argument that it has begun to replace some of its five-

abreast seating with a Two-plus-Two configuration.

*Id.,* J.A. I. 285–86.[10] Moreover, the reconfiguration of the aircraft to remove some lounges could be completed within 48 hours. *See, e. g.,* CAB Order 71–3–80 (Mar. 12, 1971), J.A. I. 62. This is not to say that all airlines would have removed their lounges had the Board not stepped in. For some with continued low load factors, such as Continental, a more commodious seating arrangement would still be economical and would be a competitive asset. Nevertheless, apparently when carriers determined that offering lounge services cut into potential revenues, they did not need the artificial incentives offered by the Board to make the decision to eliminate that service. Certainly there is little in the record to support the Board's prediction that the airlines would continue lounge service even where demand for seats was so great that the inconvenience to passengers and the monetary loss by the carriers became substantial.

## V

The Board in attempting to buttress its assertion of authority to promulgate its Phase 6A standards argues that the "basic policy of ratemaking is to gear revenues as closely as possible to costs and value of service." CAB's Br. at 39 (footnote omitted); *see, e. g., Permian Basin Area Rate Cases,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). Central to those ratemaking determinations, according to the Board, are the accommodations provided under each designated class of service. CAB's Br. at 41. The Board feels that preservation of the distinction between the tariffs accompanying the existing classes of service is of major importance to ensure that the carriers maintain sufficient levels of revenue and to protect the carriers from destructive competition. Consequently, the Board argues that the rate differential standards are necessary to prevent destructive competition and are merely a natural application of the Board's consistent policy of distinguishing between classes of services in ratemaking.

The Board places primary reliance on its previous decision in *TWA Siesta Sleeper-Seat Service,* 27 C.A.B. 788 (1958). In that case, the Board disallowed TWA's first-class fare for a seat with more room between rows, a much greater degree of recline, and a special footrest that could be used in conjunction with the seat. *Id.* at 789. The Board found that providing sleeper service at first-class fares would unfavorably affect the general passenger-fare level and would tend to break down fare regulation between different classes of service. The Board opined that:

> The basic difference between coach and first-class service lies in seating density, and only so long as the carriers adhere to the requisite seating configurations for given classes of service is it possible to maintain any effective regulation over the reasonableness of the fares charged. Were the carriers free to progressively reduce the seating density in "coach service" in order to compete against each other, the inevitable result would be the disappearance of coach service, and the substitution of first-class service at coach fares, with a drastic reduction in the overall yield of the carriers from their passenger services. This kind of competition—competition in giving away more luxurious seating—may suit the immediate objective of a given carrier in attempting to divert existing traffic, but it is just the kind of destructive competition that the Act was designed to prevent.

*Id.* at 794–95.

We do not dispute the wisdom of the Board's policy in attempting to sustain the distinction between classes of service on the basis of cost, as exemplified by the *Siesta Sleeper-Seat* decision. We also do not find merit in petitioner's contention that section 1002(e)(5) of the Act, establishing as one ratemaking criteria the needs of *each* carrier, precludes the Board from considering in ratemaking industry-wide factors. However, we

**10.** Continental also indicated at oral argument that its lounge seats were for sale.

cannot conclude that the Board was attempting to price the value of the services at issue or to maintain the distinction between classes on the basis of cost, for the Phase 6A standards authorize reductions which have no relation to the costs of the service involved.

First, the Board in justifying its fare differential standards in Phase 6A ignored in its computations the passenger load-factor standards laboriously developed in Phase 6B of its Investigation. *See* CAB Order 71–4–54 (Apr. 9, 1971), J.A. I. 141. The Board in Phase 6B established a 55 per cent capacity passenger load factor. However, instead of basing its fare reduction on the actual cost to the airlines of offering more commodious seating utilizing the passenger load calculations, the Board measured cost by what an airline would lose if every flight was filled to capacity. It then awarded lower fares allegedly justified because of the "cost savings" the carrier received by providing more seats. Based on the Board's own Investigation, however, much of this so-called cost savings will never exist. It is highly questionable whether such hypothetical savings are a valid basis for ratemaking. Such a basis seems to be "blinking reality", *cf. Moss v. CAB,* 139 U.S.App.D.C. 150, 430 F.2d 891 (1970), and the Board does not appear to be engaging in the "reasoned decision making" required of it, *see Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 383, 444 F.2d 841 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971).

There is, however, an even more fundamental deficiency in the Board's approach. According to the Board's own

policy, fares will be based on an aircraft's most dense configuration and on a configuration containing no lounge. Fares would then be computed on the basis of the costs of providing such a service and should reflect the value of that service. Each carrier's fare structure would be based on these calculations. No one takes issue with these procedures. If then, however, the Board allowed a rate reduction so that, for example, a carrier could remove its lounge, it would be authorizing that carrier to operate below the costs and the value of the loungeless service previously calculated. It is presumably this hard economic fact that prompted the Board to promise that once all lounges were removed, the fares could again return to their higher, "at cost" level.[11]

Consequently, the TWA *Siesta Sleeper-Seat* case—based on the principle of preservation of the distinction between classes of service on the basis of actual cost—cannot help the Board here. What the Board is doing here is neither preserving the distinction between classes of service, nor attempting to gear revenues to costs. It is simply attempting through artificial ratemaking to eradicate services which it regards as "needless frills." [12] This the Board cannot do. We find that this type of "ratemaking" which authorizes fare reductions below costs and the value of services involved for the sole purpose of dictating accommodations is an abuse of the Board's ratemaking powers under section 1002 of the Act. Moreover, we find that these standards are an unwarranted intrusion into the regulation of carrier accommodations, which are pro-

---

11. It was also presumably this hard fact which prompted the Administrative Law Judge who considered the fare differential in the *Los Angeles-Chicago Case* to suggest that the differential be applied as a surcharge rather than a reduction. *See* Initial Decision, *supra* note 7, at J.A. IV. 1044–46. However, the Board, when reviewing that decision, rejected that suggestion. *See* Order 74–10–27, *supra.*

To the Board's credit, in its latest order which established a $5 fare differential for coachless Chicago-Los Angeles service, it em-

ployed Phase 6B load factor standards in its calculations. *Id.* at 7. However, the Board still instituted the fare differential for nonlounge service as a reduction from current fare levels—levels which were previously calculated on the basis of the identical loungeless configuration. *Id.* at 8 n. 13.

12. In its latest Order, the Board admitted that it has a general policy "to eliminate *free* lounge service." *Id.* at 4 (emphasis in original).

tected from such unjustified interference by section 401(e)(4) of the Act.

## VI

Since we find that the standards established in Phase 6A must be set aside, their implementation in the orders under review in No. 73–1714 also cannot stand. In those orders, the Board allowed a $10 fare reduction by United for loungeless service between Chicago and Los Angeles while suspending the matching Continental fare which retained lounge service. There is ample evidence demonstrating that the Board's rationale behind these orders was to eliminate coach lounges. The Board found lounges to be "an unnecessary potential drain on the carriers' earnings" and an "unnecessary frill." CAB Order 73–6–4 (June 1, 1973), J.A. I. 325. The conclusion that the Board was operating through the guise of ratemaking to ensure elimination of the lounges is best demonstrated by the fact that the Board initially allowed the identical fare reduction, $10, for loungeless service in the Chicago-Los Angeles market that it had previously authorized in the New York-Los Angeles market.[13] It is difficult to imagine how sufficient justifications existed for these identical reductions since (1) the New York-Los Angeles market represents a distance of 2578 miles while the Chicago-Los Angeles route spans 1744 miles and (2) the $10 reduction represents an eight percent reduction in the Chicago-Los Angeles fare while only a six per cent reduction in the New York-Los Angeles fare. See Continental's Reply Br. at 18 n. 11. We, therefore, find that these actions constituted an abuse of the Board's ratemaking power and an unjustified attempt to regulate accommodations.

In so doing, we reject the Board's contention that these suspension orders are insulated from judicial review. We recognize that a legitimate exercise of the Board's suspension power will not be reviewable. See, e. g., United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); Arrow Transportation Co. v. Southern Railway Co., 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963). However, the Board orders challenged here are not a legitimate exercise of its discretionary suspension power. Here, the Board through selective application of its suspension authority attempted to coerce petitioner to conform to its preferences as to aircraft accommodations.

The suspension order, therefore, is a sham, designed to implement a policy and assertion of authority outside the Board's statutory power. The Board cannot be allowed to cloak actions outside its authority in the guise of suspension orders and thus insulate them from judicial review and control. To shield such orders from review would allow the Board to "become a monster which rules with no practical limits on its discretion." See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). Hence, this case is similar to Moss v. CAB, supra, where we held that a suspension order, which in reality established rates without the proper procedures was subject to review.[14]

---

13. Of course, the Board has now reduced the differential to $5. See id.

14. United States v. SCRAP does not undermine the vitality of Moss. 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). Justice Stewart in SCRAP distinguished Moss without questioning the validity of its holding. Id. at 693, 93 S.Ct. 2405, n. 17. Moreover, the Court in SCRAP recognized the validity of a Court's inquiry into the agency's motive behind the use of its suspension power.

We also note that while the orders questioned here may be technically moot since the six month suspension period has expired, we feel compelled to reach the merits since this again would effectively shield any action taken as a suspension order from review. To dismiss the petition as moot would result in its being "capable of repetition, yet evading review." Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). See also Roe v. Wade, 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Moore v. Ogilvie, 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969).

In summary, we conclude that some of the premises from which the Board fashioned its Phase 6A standards were arbitrary and capricious. We hold that the Board cannot delay implementation of its fare level standards on the basis of industry practice. We also find that the Board abused its ratemaking and suspension powers by authorizing fare differentials based on hypothetical cost savings which lowered the carriers fares to below calculated cost factors in an attempt to eradicate disfavored accommodations. Finally, we hold that the Board violated section 401(e)(4) of the Act by interfering with managerial discretion as to accommodations without showing the necessity for actions to promote other valid statutory objections. Consequently, the four Board orders in Nos. 73–1714 and 73–1718 must be set aside.

Remanded for further proceedings consistent with this opinion.

J. SKELLY WRIGHT, Circuit Judge (dissenting):

I regret my inability to join the opinion of the court or the result it reaches.

The issue raised in Appeal No. 73–1714 appears to be moot. With respect to the suspension order there challenged, the six-month maximum period of suspension permitted by Section 1002(g) of the Act, 49 U.S.C. § 1482(g) (1970), has expired. In any event, in my judgment this court does not have jurisdiction to review the suspension order. *See United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Arrow Transportation Co. v. Southern R. Co.*, 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963); *compare Moss v. CAB*, 139 U.S. App.D.C. 150, 430 F.2d 891 (1970).

Appeal No. 73–1718 challenges the Board's Phase 6A decision which is described in detail in the court's opinion. But the Phase 6A decision is merely a statement of general policy for future application of an *ad hoc* basis. We cannot review the application of that policy to petitioner until we have before us the Board's final order stemming from the investigation in which it entered the now expired suspension order (the subject of Appeal No. 73–1714). Until then, there is no "administrative decision [which] has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). At that time judicial review will be available at the instance of any party aggrieved by the order. "Such review will provide an adequate forum for testing the regulation [here policy] in a concrete situation * * * where more light may be thrown on the * * * statutory and practical justifications for the regulation." *Toilet Goods Assn. v. Gardner*, 387 U.S. 158, 165–166, 87 S.Ct. 1520, 1525, 18 L.Ed.2d 697 (1967). Under the circumstances, in my judgment the Board's statement of general policy announced in its Phase 6A decision is not ripe for review.

I respectfully dissent.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

## ORDER

PER CURIAM.

On consideration of respondent's petition for rehearing and suggestion for rehearing *en banc*, it is

Ordered by the Court *en banc* that the above entitled cases shall be reheard by the Court sitting *en banc*. It is

Further ordered by the Court *en banc*, *sua sponte*, that the opinions and judgment filed in the above entitled cases on November 7, 1974 are hereby vacated.

### On Rehearing En Banc.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges, sitting en banc.

Opinion for the Court filed by Circuit Judge McGOWAN.

Concurring opinion filed by Circuit Judge WRIGHT.

Concurring opinion filed by Circuit Judge LEVENTHAL.

Circuit Judges TAMM, MacKINNON, ROBB and WILKEY concur in the Court's opinion with respect to 73–1718, but would reinstate the division's judgment and opinion in 73–1714.

McGOWAN, Circuit Judge:

We agreed to rehear these consolidated direct review petitions *en banc* for the limited purpose of inquiring into the timeliness and propriety of the division's opinion granting review of the orders in question. 173 U.S.App.D.C. ——, 522 F. 2d 107 (1974). We have confined ourselves, as a full court, to resolving these questions, and have refrained from reexamining the merits of the division's decision.

In No. 73–1718 review is sought of the orders in which the Board announced the seating configuration policy that it had evolved in Phase 6A of its Domestic Passenger Fare Investigation. Our concern was with whether these orders are ripe for review. Having concluded that they are, we leave the division's opinion in No. 73–1718 undisturbed, and direct its reinstatement.

No. 73–1714 is an appeal of a Board order suspending a rate filing. Exercises by regulatory bodies of their statutory authority to suspend for limited periods of time and effectiveness of rate filings have not normally been thought to be judicially reviewable at any time, although it is said that an exception should be made here because the Board was abusing its suspension power in aid of its invalid Phase 6A policy. We do not decide that question, however, since we have concluded that, given the invalidation of that policy in No. 73–1718, the panel opinion in No. 73–1714 should remain vacated because the appeal is moot.

### No. 73–1718

The background of this appeal, given in some detail in the panel opinion, is reiterated here only as it relates to the question of ripeness. The Board set out in Phase 6A of its Domestic Passenger Fare Investigation "to establish seating configuration standards" for passenger aircraft.[1] Its concern was with one aspect of the familiar phenomenon of airline service competition: effectively prevented by the Board from competing in price, the carriers vie for the favor of the travelling public by offering it a variety of extra services and "frills"—more frequent flights, more exotic meals, and, in this instance, more room for its knees and elbows. But such services are expensive. They eat away the reasonable rate of return which it is the function of the regulated fare level to safeguard. When fare increases are ultimately granted to restore that rate of return, the cost of the services ends up where all costs ultimately do—in the lap of the travelling public.

The Board's specific fear with respect to seating configuration was that competition "would ultimately force a large-scale conversion [from 6-abreast] to 5-abreast service," and that "this in turn would of necessity result in either increased fares or reduced service to the public."[2] The same was expected to happen with wide-bodied aircraft, which normally seat 10-abreast (in the case of the B–747) or 9-abreast (in the case of the DC–10 and L–1011), but which the airlines might be forced by competition to convert to configurations of 9- or 8-abreast. Also taken up in Phase 6A was the kindred danger that whole sections of seats would be eliminated in favor of passenger "lounges."

Order 72–5–101 embodies the Board's final decision in Phase 6A. It, along with the Board's Order on Reconsideration, is the subject of this appeal. Order 72–5–101 styled itself as neither a "rule" nor a "policy statement." It simply stated "conclusions" and made "findings." The major "findings" were that (1) future fares would be calculated on the basis of 6- and 10-abreast seating, (2) the earlier-considered alternative of requir-

---

1. Order 72–2–121, J.A. 52.

2. Order 72–5–101, J.A. 261.

ing a surcharge for low density seating would be abandoned, and (3) the threat of "large-scale conversion" to such seating would be averted by permitting fare differentials, in certain circumstances, between high and low density carriers.

As clarified in the Order on Reconsideration, the plan adopted was this: a high density carrier (*i. e.,* one with loungeless and 6 or 10/9-abreast seating) would, upon a showing of "adverse competitive impact" from the operations of a low density carrier, be permitted a fare reduction that was "reasonably related to cost savings." The low density competitor would not be permitted to match the reduction except on a showing of "special or unusual circumstances."[3] The announcement of this plan is the agency action that petitioners assert is ripe for our review.

The law of ripeness, once a tangle of special rules and legalistic distinctions,[4] is now very much a matter of practical common sense. *Abbott Laboratories, Inc. v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), dominates the field. It teaches that

the ripeness doctrine['s] . . . basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by challenging parties.

The same case prescribes a methodology for deciding whether a particular agency action is ripe for review:

The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

*Id.* at 148–49, 87 S.Ct. at 1515.

The label an agency attaches to its action is not determinative.[5] The action may be reviewable even though it is merely an announcement of a rule or policy that the agency has not yet put into effect.[6] Indeed, agency action may be reviewable even though it is *never* to have any formal, legal effect.[7] What is

---

**3.** Order 72–5–101, J.A. 293–94; J.A. 343–49. The Orders are not models of clarity. 72–5–101 separately discusses the three kinds of high density carrier, 6-abreast, 10/9-abreast, and loungeless. It mentions the "special and unusual consequences" exception in connection with all three. It mentions the "adverse competitive impact" requirement only in connection with 6-abreast and loungeless carriers, however, and it mentions the "related to cost savings" requirement only in connection with 10/9-abreast carriers. J.A. 294. Order 73–6–102 makes clear that all conditions apply to fare reductions in all three cases, but introduces the new principle that fare differentials must be "based upon cost of service and *value of service* considerations." J.A. 346 (emphasis added).

**4.** *See Chicago & S. Air Lines, Inc. v. Waterman Steamship Corp.,* 333 U.S. 103, 112–13, 68 S.Ct. 431, 437, 92 L.Ed. 568 (1948) (administrative orders reviewable only when they "impose an obligation, deny a right or fix some legal relationship"); *United States v. Los Angeles & S.L.R.R.,* 273 U.S. 299, 309–10, 47 S.Ct. 413, 414, 71 L.Ed. 651 (1927) (administrative order not reviewable if it does not "command the carrier to do, or refrain from doing,

anything; . . . grant or withhold any authority, privilege or license; . . . extend or abridge any power or facility; . . . subject the carrier to any liability, civil or criminal; . . . change the carrier's existing or future status or condition; . . . [or] determine any right or obligation").

**5.** *See Columbia Broadcasting System v. United States,* 316 U.S. 407, 416, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942); *Sea-Land Service, Inc. v. Federal Maritime Comm'n,* 131 U.S.App.D.C. 80, 402 F.2d 631, 633 (1968) ("[W]hat is decisive is the substance of what is done.").

**6.** A striking case is *Flemming v. Florida Exchange,* 358 U.S. 153, 167–68, 79 S.Ct. 160, 3 L.Ed.2d 188 (1958), in which immediate review was granted of an FDA regulation banning the use of certain artificial coloring agents for oranges, even though the regulation was not to take effect until three years after its promulgation.

**7.** In *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58–66–69, 83 S.Ct. 631, 638, 9 L.Ed.2d 584 (1963), review was granted of a state agency's informal exhortations to book and magazine distributors not to sell certain publications deemed by the agency to be "objectionable for

required is that the interests of the court and agency in postponing review until the question arises in some more concrete and final form, be outweighed by the interest of those who seek relief from the challenged action's "immediate and practical impact" upon them.[8] The former interests are encompassed within the first half of the *Abbott Laboratories* "twofold aspect" the "fitness of the issues for judicial decision," while the latter interests are expressed in the second part, the "hardship to the parties of withholding court consideration." We take them up in the same order.

■ The interest in postponing review is strong if the agency position whose validity is in issue is not in fact the agency's final position. If the position is likely to be abandoned or modified before it is actually put into effect, then its review wastes the court's time and interferes with the process by which the agency is attempting to reach a final decision. It was for this reason that we considered review premature in *Pacific Gas & Electric Co. v. FPC,* 164 U.S.App. D.C. 371, 506 F.2d 33 (1974). The "Statement of Policy" therein sought to be reviewed set out the Commission's views on the proper allocation of natural gas supplies during periods of shortage. We concluded that those views were only tentative, however. Suppliers were subsequently to submit for Commission approval specific plans for the curtailment

of deliveries of scarce supplies. The "Statement of Policy" proposed an order of end-use priorities that those plans might incorporate. It was issued without notice or opportunity for comment, and its aim was "not to provide for an inflexible, binding rule but to give advance notice of the general policy with respect to curtailment priorities that the Commission prefers." *Id.* at 378, 506 F.2d at 40. The Commission expressly foresaw challenges to this policy in connection with its review of individual curtailment plans.

By contrast, there is every indication that the Board considers its position on seating configuration to be final. That position was developed in formal, adjudicatory proceedings that consumed more than two years' time.[9] The last comparable investigation was the "extremely lengthy and complex" *General Passenger Fare Investigation* of a decade earlier.[10] Order 72–5–101 purports in terms to be the Board's "final decision on the matter."[11] It follows an earlier "tentative decision" and itself contains no equivocal or tentative language.[12] We may take judicial notice of the fact that the policy it establishes of allowing fare differentials for the protection of high density carriers has since been applied by the Board in two concrete instances, and that in one of these instances the Board expressly ruled that the policy was "not subject to review in this proceeding."[13]

sale . . . to youths." The state agency had no legal power to inhibit the sale of the publications (it could only recommend that the Attorney General prosecute), yet the Court "look[ed] through forms to the substance" of the matter, which was that an "informal censorship" was being imposed.

**8.** *Frozen Foods Express v. United States,* 351 U.S. 40, 44, 76 S.Ct. 569, 100 L.Ed. 910 (1956).

**9.** Six of the nine phases of the *DPFI,* including Phase 6A, were conducted in adjudicatory rather than rule-making proceedings. Order 70–2–121, J.A. 49. The *DPFI* was instituted in January of 1970. Order 70–1–147, J.A. 33. The final order in Phase 6A was issued on May 26, 1972. Order 72–5–101, J.A. 252. The Order on Reconsideration was issued on June 26, 1973. Order 73–6–102, J.A. 333.

**10.** Order 7–1–147, J.A. 70.

**11.** J.A. 256.

**12.** A sample of the Board's language is the following:

Any carrier operating a 6-abreast in markets competitive with narrow-bodied 5-abreast aircraft . . . may lower its fare to a level necessary to meet such competition, and the operator of the less dense configuration will be permitted to match the lower fares only on a showing of special or unusual circumstances.

J.A. 297.

**13.** Order 74–10–27 at 3 (filed October 10, 1974). This was the Board's final order following its investigation of the Chicago-Los Angeles rates whose suspension is sought to be reviewed in Nos. 73–1714. *See, infra,* 173 U.S.

It is true that Order 72–5–101 contains conditions on the allowance of fare differentials which may not be met in every case. A high density carrier must show that the differential is necessary to redress some degree of adverse competitive impact.[14] The differential must be reasonably related to cost savings, and not offset by "special and unusual circumstances." But these conditions of the Board's policy do not affect its finality. They are elements—and ostensibly final elements—of the policy itself. They form a part of the question: *may* the Board allow cost-related fare reductions to meet the competitive threat of low density seating, absent "special and unusual circumstances"? Since we will be confronted by this same question whether we grant review now or later, we conclude that the challenged Board policy is, in the appropriate sense, final.

Of this issue's fitness for resolution in other respects there can be little doubt. It turns very largely on the "purely legal" question of the proper construction of Section 401(e)(4) of the Federal Aviation Act, 49 U.S.C. § 1371(e)(4) (1970), prohibiting regulation of "accommodations and facilities" by the Board.[15] It also requires an understanding of the economics of seating configurations and of the practical consequences of the Board's fare differential policy. But these are matters relating to airlines and

airline regulation generally. We think the panel could competently explore them outside the setting of a concrete application of the policy.

The "hardship to the parties of withholding court consideration" seems substantial in this case. Characteristically, the hardship of delayed review is that it places those who seek it in the following dilemma: in the meantime they must either comply with the agency's policy, at some expense which they maintain is unnecessary, or they must risk incurring the sanctions for non-compliance should they turn out to be wrong. If this dilemma is sufficiently acute, then the policy has been "felt in a concrete way by the challenging parties."[16]

The Board policy in this case is to prevent the spread of low density seating and to encourage its elimination by those who already offer it. The burden of compliance with that policy is obviously substantial. It was estimated by one airline that its cost of conversion from 5- to 6-abreast seating would be $2 million or one third of its annual domestic operating profits.[17] The sanction for non-compliance with the Board's policy is exposure to an adverse fare differential. Of course the sanction is not automatic. Still, the recalcitrant low density carrier can be reasonably sure of incurring it. Some high density competitor is bound

App.D.C. pp. ——–——, 522 F.2d pp. 128–129. The other concrete application of the policy occurred in the New York-Los Angeles market. *See, infra*, 173 U.S.App.D.C. p. ——, 522 F.2d p. 127.

**14.** Order 72–5–101 requires a showing of a "risk of adverse competitive impact." On reconsideration the Board stiffened this requirement for 6- and 10/9-abreast carriers, whom it will permit to lower their fares only on a showing of "actual harm." Order 73–6–102, J.A. 348. The requirement remains the same for non-lounge carriers, but it was relaxed in the case of carriers who offer lounge service and would like to eliminate it. The latter may lower their fares if "the risk of adverse competitive impact would otherwise inhibit such conversion." *Id.* at 360–61.

**15.** *See Abbott Laboratories, Inc. v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18

L.Ed.2d 681 (1967) (issue was fit for resolution in part because it was "a purely legal one: whether the statute was properly construed by the Commissioner"). *Accord National Automatic Laundry and Cleaning Council v. Shultz*, 143 U.S.App.D.C. 274, 443 F.2d 689, 695 (1971).

**16.** *Abbott Laboratories, Inc. v. Gardner*, 387 U.S. 136, 152–53, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). *See also* K. C. Davis, *Administrative Law Treatise* 674 (Supp.1970) (endorsing the "basic proposition that administrative action which creates a dilemma for a private party who must choose between disadvantageous compliance and risking serious penalties is ripe for challenge").

**17.** Order 71–4–48, J.A. 96.

to seek a fare differential, and it seems more than likely that the Board will approve the differential, at least in part. Once again, we may take judicial notice of the fact that it has done so twice already. And perhaps this is not surprising. The Board's entire policy is predicated on the "competitive impact" of low density seating, and also on the fact that in the long run high density seating necessarily brings about per-seat cost savings. As for the "special and unusual circumstances" that may protect a low density carrier, all we know is that no such carrier has yet been able to claim them.

A fare differential is a sanction too punishing to be endured for any significant period of time. That is certainly the lesson of the Board's first application of its fare differential policy. In January of 1973 it announced that it would permit Trans World Air Lines to reduce its fare for non-lounge service between New York and Los Angeles. The reduction was justified as necessary to make TWA's loungeless flights competitive with the lounge service of other carriers flying the same route. But the reduction apparently never went into effect. Rather than suffer the effects of a fare differential, the carriers agreed to "mutually acceptable programs for the re-

moval of their wide-bodied lounges," and the TWA tariff was withdrawn.[18]

To be sure, an airline's exposure to a fare differential can be ended at any time by a decision to eliminate low density seating. Thus, an airline which seeks a court test need hold out only as long as it takes to secure judicial review. But judicial review may be a long time in coming. *United States v. S.C.R.A.P.,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), and *Arrow Transportation Co. v. Southern Ry.,* 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963), holding that rate suspension orders are in general unreviewable, suggest that the fare differential must be endured, if it is to be challenged, for the entire six months' suspension period. We do not decide whether a fare differential suspension order would be reviewable or not, but merely observe that the possibility of its being unreviewable might well be enough to dissuade the airlines from contesting the Board's policy at all.[19]

Even assuming that the courts would, by staying and granting review of the suspension order, afford a realistic chance to challenge the Board's policy at that later juncture,[20] still the delay works a considerable hardship. Aircraft cannot be converted overnight. The ex-

18. *See* Orders 73–1–69 and 73–6–4, J.A. 316, 321, 323. The New York-Los Angeles experience seems to provide a complete answer to what is perhaps the most compelling argument for postponing review, namely, that the validity of fare differentials turns on the degree to which they can be justified by cost savings, and that this cannot be known until the Board grants a particular differential on the basis of a particular cost justification. But it is clear that the invalidity of the Phase 6A policy does not depend on any assumption as to the relationship of fare differentials to costs. The problem is that the policy is likely never to lead to *any* differential, cost-justified or otherwise, but simply to the elimination of low density seating without any fare change at all.

19. It appears that the Board almost achieved this objective, at least with respect to the lounges. The "mutually acceptable" programs

for lounge removal which resulted from the threatened New York-Los Angeles differential apparently were entered into by all or most of the carriers. The matter might never have come up again had not Continental Air Lines decided that its low load factors prevented it from going along. The fare reduction sought in the Chicago-Los Angeles market was in a sense a device to bring Continental into line. The carriers seeking the reduction argued to the Board that Continental's decision "threaten[ed] their ability to continue the lounge removal program." *See generally* Order 73–6–4, J.A. 321, 323.

20. Such a stay and grant of review were, of course, obtained by Continental in No. 73–1714. Suffice it to say that Continental's success in this respect could scarcely have been confidently predicted in light of the *S.C.R.A.P.* and *Arrow* holdings.

pense of delaying and then having to do so hurriedly might be considerable. In any case definite plans cannot be made. One wonders, for example, how the airlines are to deal with the problem of advance reservations for the flights in question. As was said of the agency action held ripe in *United States v. Storer Broadcasting Co.*, 351 U.S. 192, 199, 76 S.Ct. 763, 769, 100 L.Ed. 1081 (1956), these orders "now operate to control the business affairs" of the airlines.[21]

■ We do not pretend that the science of assessing an issue's ripeness is an exact one. Agency positions are never absolutely final. There is always some danger in accelerating the review process, and always some hardship in delaying it. If the analysis is an imprecise one, however, it may nevertheless yield clear results, as we think it has in this case. Any doubts we might have are resolved by the presumption of reviewability which we have previously said "permeates the *Abbott Laboratories* ruling." *National Automatic Laundry and Cleaning Council v. Shultz*, 143 U.S.App. D.C. 274, 443 F.2d 689, 694 (1971). The presumption stands on firm ground. However much the courts might prefer to resolve a particular question at another time and place, they should have a very good reason for indulging that preference, if in doing so they are refusing a petitioner's request to be relieved of an onerous legal uncertainty. Our *en banc* inquiry has disclosed no such reason.

### No. 73–1714

We have already recounted the short history of the New York-Los Angeles fare differential, the Board's first application of its fare differential policy. The second application came several months later in the Chicago-Los Angeles market. United Air Lines and several other carriers filed in April of 1973 for a reduction of ten dollars in the fare charged for non-lounge service between those two cities. Continental Air Lines, a lounge operator, filed a matching reduction. Continental's tariff was suspended for three months; the others were not.[22] No. 73–1714 is the appeal taken from that suspension order.

Like the New York-Los Angeles suspension order, this one has never actually resulted in a fare reduction. Indeed, in the implementation of the Phase 6A policy, a fare reduction appears to be the one thing that in practice will never happen. If a fare differential is genuinely threatened, because the tariff by which the low density carrier seeks to match the high density carrier's reduction is suspended, then the low density carrier will yield. It will agree to some "mutually acceptable program" for increasing its seating density, and in return the high density carrier will withdraw its fare reduction. If, on the other hand, it becomes clear that a fare differential will not be permitted, because a suspension order is not issued or is judicially stayed, then the high density carrier will yield. It will withdraw its fare reduction and look for some other way to respond to the threat of low density seating—perhaps by offering such seating itself. In either case the fare reductions and the suspension order never actually take effect. They are merely the formal steps by which it is learned whether the Board will decide, and be permitted, to authorize a fare differential.

21. See also *Frozen Food Express v. United States*, 351 U.S. 40, 44, 76 S.Ct. 569, 571, 100 L.Ed. 910 (1956) (declaratory order that certain motor carriers were within ICC jurisdiction was ripe because it "sets the standard for shaping the manner in which an important segment of the trucking business will be done"); *Columbia Broadcasting System v. United States*, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942) (FCC's announcement that it would not relicense broadcasters entering certain kinds of contracts held ripe in part because it might cause "wholesale cancellation" of such contracts); *Textile and Apparel Group v. FTC*, 133 U.S.App.D.C. 353, 410 F.2d 1052, 1054, cert. denied, 396 U.S. 910, 90 S.Ct. 223, 24 L.Ed.2d 185 (1969) (FTC rule regarding inspection of imported wool held ripe before enforcement in part because it would "wreak havoc" with delivery schedules).

22. Order 73–6–7, J.A. 321.

The first of our two scenarios describes what happened in the New York-Los Angeles market. The second describes what happened in the case of the suspension order now under review. That suspension order, had it not been stayed, would have prevented Continental from matching the fare reductions filed by United and the other non-lounge carriers. It might well have forced Continental to remove its lounges. But Continental succeeded in obtaining, from a motions panel of this court, a stay of the suspension order pending its appeal. The object of their fare reductions having been at least temporarily defeated, the non-lounge carriers withdrew them.[23]

The Board apparently issued no further suspension orders. It did proceed to investigate the Chicago-Los Angeles fare reductions sought by both Continental and the high density carriers. That investigation ended with an order, issued on October 10, 1974, limiting the high density carriers to a five dollar fare reduction and prohibiting any reduction at all by Continental.[24] On October 22, 1974, the Board stayed the effectiveness of that order pending consideration of petitions for reconsideration.[25] Such petitions have apparently been filed, but the Board has yet to act on them. Quite possibly it is awaiting the outcome of the present challenge to the Phase 6A policy.

■ The foregoing is the history of a suspension order which, if it ever had any effect, certainly has none today. It expired by its own terms on August 29, 1973.[26] Whether the Board could now issue a new suspension, its power to do so having been extended beyond the normal six month period by this court's stay of the former suspension, is a question we need not reach. The appeal is moot if no suspension is now in effect, and all

parties, including the Board, agree that none is.[27]

Nor is there a strong argument for our regarding this appeal as only "technically moot" and proceeding to decide it nonetheless because it involves a recurrent question which would otherwise escape judicial review. *See Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911). The question we would be deciding has to do not with the Board's substantive policy, which the panel has already invalidated, but with the reviewability of its suspension orders. That question may conceivably recur, but not in the same form as it is presented here.

The issue, in brief, is whether the particular suspension order falls within the holding of the *S.C.R.A.P.* and *Arrow* cases that such orders are generally unreviewable, or within the exception stated in *Moss v. CAB*, 139 U.S.App.D.C. 150, 430 F.2d 891 (1970), for "sham" suspensions aimed at coercing behavior rather than merely preserving the status quo pending investigation. How this issue is resolved greatly depends on the circumstances of the particular suspension order. The circumstances of this one will not recur. We may assume that the Board will issue no further suspension orders implementing its invalid seating configuration policy. Other suspension orders, having different justifications and different practical effects, will pose different questions of reviewability. It would be of little help in resolving those questions if we were to reach out to decide this one. The policy that underlay this suspension order has not escaped review, and the question of reviewability that it presents is one which we see no good reason to decide.

The decision and opinion of the division in No. 73–1718 are directed to be

---

**23.** Br. Intervenors United Airlines and Delta Airlines at 3.

**24.** Order 74–10–27.

**25.** Order 74–10–114.

**26.** Order 73–6–4, J.A. 325.

**27.** *See, e. g.*, Respondent's Supplemental Memorandum on Rehearing *En Banc*, at 27.

reinstated; and the petition for review in No. 73–1714 is dismissed.

*It is so ordered.*

J. SKELLY WRIGHT, Circuit Judge (concurring):

I concur in the court's opinion in No. 73–1714.

As to No. 73–1718, the Civil Aeronautics Board has now made it clear that its seating configuration policy is final, and therefore judicially reviewable, by ruling in the *Chicago-Los Angeles Fare Reductions Case* that the policy "is not subject to review in this proceeding." Order 74–10–27 at 3 (decided October 8, 1974). Under the circumstances I concur in the court's opinion in No. 73–1718 that the seating configuration policy is ripe for review. However, in the *Chicago-Los Angeles* case the Board has stayed the effectiveness of its order and deferred action on an application for reconsideration apparently pending our decision in this case. I would instruct the panel to await the Board's action on reconsideration before proceeding further. In this way the panel's decision on the merits may be informed by the Board's application of the policy to a concrete set of facts.

LEVENTHAL, Circuit Judge (concurring):

I join in the court's en banc opinion insofar as it finds ripeness for review in Docket No. 73–1718, wherein petitioner Continental Air Lines, Inc. seeks review of the seating configuration policy evolved by the Civil Aeronautics Board in Phase 6A of its Domestic Passenger Fare Investigation.

I also join in the court's remission of the merits of that review to the panel which first considered the matter. This does not betoken either agreement or disagreement with the panel's conclusion. It signifies rather that the question is one, requiring study of the record and its significance, that would excessively displace the energies of the judges on the court en banc, each of whom is engaged in his own fair share of time-consuming and record-reading decisions to render on the merits.

I depart from the en banc court's opinion in dismissing the petition to review in No. 73–1714, though I concur in that result. I agree that the circumstances of the particular suspension order greatly affect whether it falls within the general rule that suspension orders are not reviewable,[1] or within the exception developed in *Moss v. CAB* for "sham" suspensions by an agency that engages in regulation in such a way as to avoid statutory procedures and the resulting judicial review.[2]

But for my part it was not the review in Docket No. 73–1718 but the review in 73–1714 that raised the kind of questions that merited en banc consideration. An irksome problem of judicial administration is presented if a panel of this court reviews and stays suspension orders, and notwithstanding concern over the court's jurisdiction the matter lapses because, by the time the court en banc can deliberate, the suspension order, usually of 6-months duration, has expired. In my view the en banc court having heard oral argument, should reach the question whether the suspension order is reviewable under *Moss*. The fact that the particular facts are unique—as they always seem to be—is not dispositive. For many doctrines application depends on particular circumstances, yet particular cases are the means a court uses to define the general underlying approach that is sound.

Having said that, I add briefly that in my view the *Moss* doctrine is inapplica-

---

1. *United States v. S.C.R.A.P.*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Arrow Transportation Co. v. Southern R. Co.*, 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963).

2. *Moss v. CAB*, 139 U.S.App.D.C. 150, 159, 430 F.2d 891, 900 (1970).

ble to the kind of case before us. That limited doctrine extends judicial power where an agency is using the suspension authority so as to avoid or limit the judicial review provided by Congress for its basic decisions. Here, however, the basic decision of the CAB was in its Order 72–5–101, embodying its final decision in Phase 6A, which was ripe and reviewable when rendered May 26, 1972. In that order it ruled that a carrier could offer 5-abreast seating at its basic fare level, although that was computed on a 6-abreast basis; that a 6-abreast carrier could file a lower tariff if it could demonstrate an "adverse competitive impact" from the 5-abreast service; and that the more commodious 5-abreast carrier could match the reduced fare only upon a showing of "special or unusual circumstances." The validity of this approach was available for testing on judicial review pursuant to the Act for the reasons stated in the en banc opinion in Docket No. 73–1718, finding ripeness for review of order 72–5–101.

When on April 18, 1973, United filed a $10 fare reduction in the Chicago-Los Angeles market for non-lounge service, a move aimed at competition with Continental's lounge service, it relied on the precedent of January 23, 1973, when the CAB permitted TWA to reduce its New York-Los Angeles fare by $10 for loungeless configuration, also a move aimed at lounge competition. On June 1, 1973, the Board issued the order that allowed United's fare to go into effect, but suspended and ordered an investigation of Continental's action in filing a $10 fare reduction matching United. The panel found this suspension order was reviewable, saying:

> The suspension order, therefore, is a sham, designed to implement a policy and assertion of authority outside the Board's statutory power. The Board cannot be allowed to cloak actions outside its authority in the guise of suspension orders and thus insulate them from judicial review and control.

With all respect, the doctrine of "sham" orders cannot be triggered by a ruling that the agency has exceeded its statutory authority. That obviously sweeps far too broad. The key ingredient in *Moss* was that the CAB in that case acted solely through suspension policy, so that its underlying rate policies could in no way be judicially reviewed. In the case before us the CAB declared the underlying rate policy in Order 72–5–101, and this final order in Phase 6A became judicially reviewable when issued in May 1972. Of course, the general May 1972 policy came on for specific applications, but these were not of such a character as to evade judicial review. Indeed, the court with jurisdiction of the petition to review the 1972 order (in Docket No. 73–1718) had authority to stay the enforcement of that rate policy either in general, or in the specific application that emerged in the Chicago-Los Angeles market. There was nothing sham about the June 1, 1973 order—it was merely a specific application of the policy publicly articulated in May 1972 after full procedure.

There is full authority in the court to discharge its plenary authority to review the agency's general rule, and to protect that jurisdiction, without asserting an authority to review suspension orders. An extraordinary jurisdiction was evolved in *Moss* to handle the problem of an agency using suspension orders in such a way as to impose its regulatory will while avoiding the mechanism contemplated by Congress for judicial review. Care must be taken that this exception is not extended in such a way as to threaten the basic rule against judicial interposition into suspension orders by agencies. The exception has no proper application to this case.

Circuit Judges TAMM, MacKINNON, ROBB and WILKEY concur in the court's opinion with respect to No. 73–1718, but would reinstate the division's judgment and opinion in No. 73–1714 for the reasons stated therein.