**In re Willard C. McBRIDE, Respondent.**

No. 88–1563.

District of Columbia Court of Appeals.

Argued En Banc Jan. 8, 1991.
Decided Jan. 21, 1992.

Michael S. Frisch, Asst. Bar Counsel, the Office of Bar Counsel, argued for petitioner. Thomas E. Flynn, Bar Counsel at the time the brief was filed, and Wallace E. Shipp, Jr., Deputy Bar Counsel, Washington, D.C., were on the brief, for petitioner.

Joseph M. Jones, Washington, D.C., for respondent.

Before ROGERS, Chief Judge, and FERREN, TERRY, STEADMAN, SCHWELB, FARRELL and WAGNER, Associate Judges, and BELSON,* Senior Judge.

FERREN, Associate Judge:

In this disciplinary case, we revisit three of our decisions—*In re Willcher*, 447 A.2d 1198 (D.C.1982); *In re Kerr*, 424 A.2d 94

---

* Judge BELSON was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on July 24, 1991.

(D.C.1980) (en banc); and *In re Colson,* 412 A.2d 1160 (D.C.1979) (en banc)—to review our prior holdings that (1) all crimes with a statutory element of "intent to defraud" are crimes involving moral turpitude *per se,* and (2) D.C.Code § 11–2503(a) (1989) requires disbarment for life upon conviction of a crime involving moral turpitude.

On August 31, 1988, respondent Willard C. McBride pleaded guilty in federal court to the misdemeanor of aiding and abetting a client, Mrs. Shahid, in violating 18 U.S.C. §§ 1028(a)(4) and (b)(3) (the knowing possession of false identification document with intent to use document "to defraud the United States").[1] McBride, a member of the District of Columbia Bar since 1954 and a 28–year honored veteran of the Department of Justice, had retired in 1983 to become a solo practitioner. According to McBride's brief, his practice consisted of many pro bono referrals from his church, including a request that he help Mrs. Shahid and her two young children, immigrants from Pakistan, change their immigration status from visitor to resident alien. With McBride's assistance, Mrs. Shahid's petition to change her immigration status was conditionally granted. But as she made preparations to fly to Pakistan to appear personally at the United States Consulate there, she grew fearful that some snag in the process would prevent her from returning to the United States and would require her to stay in Pakistan where her physically abusive ex-husband resides. She panicked and pleaded with McBride to help her obtain an American passport to use to reenter the United States in case her new immigration status was not approved. McBride helped Mrs. Shahid provide the passport office with two identification documents that belonged to a third person. McBride accompanied her to that office and remained with her as she applied for and picked up the passport. McBride received no financial or any other benefit from his actions, all of which occurred within four days. On the other hand, he has never disputed that he knew his conduct was dishonest and designed to secure for Mrs. Shahid a passport to which she was not entitled.

On November 2, 1988 a federal magistrate, after noting that McBride's acts were "aberrational" and that he had "let his heart carry his head," sentenced McBride to one year of probation, imposed a fine of $25 plus the estimated $1,000 cost of probation, and ordered "100 hours of community

---

1. 18 U.S.C. § 1028 (1988) provides in part:
 (a) Whoever ...
 (1) knowingly and without lawful authority produces an identification document or a false identification document;
 (2) knowingly transfers an identification document or a false identification document knowing that such document was stolen or produced without lawful authority;
 (3) knowingly possesses with intent to use unlawfully or transfer unlawfully five or more identification documents (other than those issued lawfully for the use of the possessor) or false identification documents;
 (4) knowingly possesses an identification document (other than one issued lawfully for the use of the possessor) or a false identification document, with the intent such document be used to defraud the United States; or
 (5) knowingly produces, transfers, or possesses a document-making implement with the intent such document-making implement will be used in the production of a false identification document or another document-making implement which will be so used;
 \* \* \* \* \* \*
 (b) The punishment for an offense under subsection (a) of this section is—

 (1) a fine of not more than $25,000 or imprisonment for not more than five years, or both, if the offense is—
 (A) the production or transfer of an identification document or false identification document ...
 (B) the production or transfer of more than five identification documents or false identification documents; or
 (C) an offense under paragraph (5) of such subsection;
 (2) a fine of not more than $15,000 or imprisonment for not more than three years, or both, if the offense is—
 (A) any other production or transfer of an identification document or false identification document; or
 (B) an offense under paragraph (3) of such subsection; and
 (3) a fine of not more than $5,000 or imprisonment for not more than one year, or both, in any other case.

service, preferably in the legal community."

On March 7, 1989, this court issued an order suspending McBride from the practice of law because he had been convicted of a "serious crime" within the meaning of D.C.Bar R. XI § 10(b).[2] We also directed the Board on Professional Responsibility to initiate formal proceedings to determine the proper sanction and specifically "to review the elements of the crime ... for the purpose of determining whether or not the crime involves moral turpitude within the meaning of D.C.Code § 11–2503(a)." [3]

On July 28, 1989 the Board issued its report, concluding that 18 U.S.C. § 1028(a)(4) was a crime involving moral turpitude *per se* and recommending that McBride be disbarred for life pursuant to D.C.Code § 11–2503(a), *supra* note 3; *see Kerr*, 424 A.2d at 99. A division of this court accepted the Board's analysis and ordered McBride permanently disbarred on July 18, 1990. *See In re McBride*, 578 A.2d 1102, 1103 (D.C.1990). We granted McBride's petition for rehearing *en banc* in order to address several issues that continue to cause concern among lawyers, judges, and the public at large.

We now remand to the Board for further proceedings. We conclude, after reviewing the disciplinary history under *Colson*, that no conviction of a misdemeanor may be deemed a conviction of a crime involving moral turpitude *per se*, even though that misdemeanor may be properly character-

ized as a "serious crime," *see supra* note 2, and may be held to involve moral turpitude on the facts of the case. We also overrule *Kerr*, concluding that D.C.Code § 11–2503(a) no longer shall be construed to require disbarment of an attorney for life upon conviction of a crime involving moral turpitude.

### I.

■ D.C.Code § 11–2503(a) (1989) requires disbarment of any attorney convicted of a crime involving moral turpitude. In *Colson*, we announced procedures the Board on Professional Responsibility should follow in determining whether a crime involves moral turpitude. We required, as a first step, that the Board examine the underlying elements of the offense with a view to determining whether the statute, on its face, involves moral turpitude or instead may involve moral turpitude, if at all, only in certain instances. *See Colson*, 412 A.2d at 1164–65; *see* Board Rules 10.1 and 10.2. In the latter case, the attorney was held to be entitled to a full evidentiary hearing to explore whether the criminal conduct itself (as opposed to conviction for violating the criminal statute as such) involved moral turpitude. *See Colson*, 412 A.2d at 1165.[4] But a hearing was not required, or even permitted, when a statute on its face involved moral turpitude—commonly referred to as moral turpitude *per se*—because a guilty plea or guilty verdict was taken as conclusive evidence of

---

**2.** D.C.Bar R. XI § 10(b) reads:

(b) *Serious crimes.* The term "serious crime" shall include (1) any felony, and (2) any other crime a necessary element of which, as determined by the statutory or common law definition of such crime, involves improper conduct as an attorney, interference with the administration of justice, false swearing, misrepresentation, fraud, willful failure to file income tax returns, deceit, bribery, extortion, misappropriation, theft, or an attempt or a conspiracy or solicitation of another to commit a "serious crime."

**3.** D.C.Code § 11–2503(a) (1989) reads:

(a) When a member of the bar of the District of Columbia Court of Appeals is convicted of an offense involving moral turpitude, and a certified copy of the conviction is presented to

the court, the court shall, pending final determination of an appeal from the conviction, suspend the member of the bar from practice. Upon reversal of the conviction the court may vacate or modify the suspension. If a final judgment of conviction is certified to the court, the name of the member of the bar so convicted shall be struck from the roll of the members of the bar and he shall thereafter cease to be a member. Upon the granting of a pardon to the member so convicted, the court may vacate or modify the order of disbarment.

**4.** Once the Board determines, and this court confirms, that a violation of a particular statute inherently involves moral turpitude, an attorney convicted under that statute will be disbarred solely on the basis of the filing of a certificate of conviction. *In re Colson,* 412 A.2d at 1165.

all the underlying elements of the offense. *See id.* at 1164.

We applied *Colson*'s analysis in *Willcher*, where we held that any crime having "intent to defraud" as an essential element would be a crime involving moral turpitude *per se. See Willcher*, 447 A.2d at 1200.[5] In the present case, the Board, as well as McBride, notes that *Colson* and *Willcher* have resulted in "widely disparate treatment of attorneys whose misconduct is within the range of comparability." RE-PORT AND RECOMMENDATION OF THE BOARD ON PROFESSIONAL RESPONSIBILITY, IN THE MATTER OF WILLARD C. MCBRIDE (July 28, 1989) at 22 (reprinted at 578 A.2d 1102, 1111 (D.C. 1990) (hereafter BOARD REPORT).[6] McBride argues that such application of *Colson/Willcher* contravenes D.C.Bar Rule XI § 9(g),[7] which requires comparable sanctions for comparable misconduct.

More specifically, McBride questions the application of *Willcher*'s "intent to defraud" rule to this case. He argues that a violation of 18 U.S.C. § 1028(a)(4)—despite referring to an "intent to defraud"—does not inherently involve moral turpitude because (1) the Board must, but did not, ex-amine the entire statute, not an isolated subsection, before finding moral turpitude, and, in any event, (2) an exclusive focus on the "intent to defraud" language of a statute sweeps too broadly by mandating disbarment upon conviction under many statutes, such as 18 U.S.C. § 1028(a)(4), that do not manifestly involve moral turpitude because "defraud" has a different meaning from its common law meaning used in *Willcher.*

### A.

In analyzing McBride's case under *Colson/Willcher*, the Board examined the statutory elements of 18 U.S.C. §§ 2 and 1028(a)(4) to determine whether his crime was among those that inherently involve moral turpitude. The Board first concluded that under 18 U.S.C. § 2 [8] McBride had been "the party who aids or abets the offense [and therefore] 'is guilty under the statute as a principal.'" BOARD REPORT at 11 (quoting *United States v. Raper*, 219 U.S.App.D.C. 243, 251, 676 F.2d 841, 849 (1982)). According to the Board, under federal caselaw a conviction for aiding and

---

5. Willcher was convicted of a misdemeanor, D.C.Code § 11–2606(b) (1991), for demanding a fee directly from a client whose fee the District was to pay to Willcher as counsel appointed under the Criminal Justice Act. We characterized Willcher's conduct as "an offense involving both fraud and intentional dishonesty for personal gain"—indeed, a "double fraud" since Willcher deceived both (1) his client, "who was entitled by the CJA to a 'free lawyer,' and his [client's] family," and (2) "the judicial system itself." *Willcher*, 447 A.2d at 1200. Although D.C.Code § 11–2606(b) does not use the words "intent to defraud," we clearly implied that Willcher's conduct, in demanding a fee in violation of the statute, included an intent to defraud in that he intended to obtain property by an implied false representation that his fee, and thus his representation, would not otherwise be forthcoming.

6. The Board examined three cases in which an attorney's misconduct had been comparable to, or more egregious than, McBride's and yet the attorney had avoided permanent disbarment either because he had not been charged with a felony, *In re Reback*, 513 A.2d 226 (D.C.1986) (*en banc*), or because he had entered a plea to an offense that did not involve moral turpitude, even though he had committed perjury, *In re Hutchinson*, 534 A.2d 919 (D.C.1987), or because the felony charges against him were ultimately dismissed, *In re Thompson*, 538 A.2d 247 (D.C. 1987). *See* BOARD REPORT at 22–24 (cited in 578 A.2d at 1111–12.) The Board added that "[o]ther examples of similar anomalies have occurred, and are bound to occur in the future, as long as the court adheres to its holding in *Kerr* and the procedures of *Colson* for determining moral turpitude *per se.*" BOARD REPORT at 24 (cited in 578 A.2d at 1112) (emphasis in original).

7. D.C.Bar Rule XI § 9(g) provides in relevant part:

 In determining the appropriate order, the Court shall accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, and shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted.

8. 18 U.S.C. § 2 (1988) provides where relevant:
 § 2. Principals
 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

abetting a crime means that the aider and abettor was found to have had the specific intent to facilitate the commission of a crime by another, BOARD REPORT at 12–13, and that every element of the underlying offense allegedly committed by the other person was established. *See id.* at 13 (quoting *Raper*, 219 U.S.App.D.C. at 251, 676 F.2d at 849).[9]

The Board then examined the elements of 18 U.S.C. § 1028(a)(4) and concluded that Mrs. Shahid knowingly possessed either a counterfeit or false identification document and thus "intended to defraud the United States." Because McBride's conviction indicated that he had "guilty knowledge" of Mrs. Shahid's criminal venture and had the specific intent to facilitate her commission of a crime involving "intent to defraud the United States," McBride's conviction was for a crime which involved a "knowing intent to defraud." BOARD REPORT at 16. Under the controlling precedent of *Willcher*, therefore, the Board concluded that McBride had been convicted of a crime involving moral turpitude *per se. Id.*

McBride argues that the Board's ruling demonstrates the shortcomings of a *Willcher*-type analysis—an analysis which, in practice, compels a mechanical search through the wording of a statute for the telltale phrase "intent to defraud." The hazards of this approach, he says, are clearly revealed in cases such as this where the only subsection of the statute that contains the words "intent to defraud"—subsection (a)(4), see *supra* note 1—is also the least serious of the offenses spelled out in the statute. The harshest maximum penalties under § 1028—five-years and three-years of imprisonment, respectively—are reserved for defendants engaged in the business of manufacturing, 18 U.S.C. § 1028(a)(1), obtaining in bulk, *id.* § 1028(a)(3), or trafficking in false or bogus documents, *id.* § 1028(a)(2). See *su-*

*pra* note 1. Because, however, none of these subsections requires proof of an "intent to defraud," a conviction under any of them would escape the *Willcher* rule and would not result in summary disbarment without a hearing into the conduct that led to the conviction. McBride concludes that, ironically and unfairly, only a conviction under § 1028(a)(4)—a misdemeanor possession offense which, according to the HOUSE REPORT, "ought not to be treated as seriously as counterfeiting and trafficking offenses"[10]—can result in summary disbarment under *Willcher*.

■ McBride is not altogether correct. Although *Willcher* does say that conviction under a statute with an "intent to defraud" element involves moral turpitude *per se*, this does not mean that conviction under a statute without these words cannot inherently involve moral turpitude.[11] Neither *Willcher* nor any other case in this jurisdiction forecloses an analysis that would bring the felony provisions of § 1028(a) into the *per se* moral turpitude category (an issue we do not decide); crimes can involve moral turpitude *per se* without involving an intent to defraud. *See, e.g., In re Laurins*, 576 A.2d 1351, 1352 (D.C.1990) (conviction for obstruction of justice in administrative proceedings); *In re Meisnere*, 471 A.2d 269, 270 (D.C.1984) (conviction for perjury); *In re Phillips*, 452 A.2d 345, 346 (D.C.1982) (conviction for rape and sodomy); *In re Roberson*, 429 A.2d 530, 531 (D.C.1981) (convictions for conspiracy to sell narcotic drugs and to receive and conceal narcotic drugs).

On the other hand, if proper analysis were to demonstrate, as McBride contends, that the provisions of § 1028(a) which Congress intended as the most serious crimes do not involve moral turpitude *per se*, we agree that this obvious anomaly, as it affects lawyer discipline, would present seri-

---

**9.** For a recent analysis of the law of aiding and abetting law in the District of Columbia, as compared with federal law, *see Ingram v. United States*, 592 A.2d 992, 1000–04 (D.C.1991).

**10.** H.R.REP. No. 802, 97th Cong., 2d Sess. 13 (1982), *reprinted in* 1982 U.S.CODE CONG. & AD-MIN.NEWS 3519, 3532 (HOUSE REPORT).

**11.** Indeed, this court in *Willcher* itself found an intent to defraud implied, not expressly stated, by the violation of D.C.Code § 11–2602(b). *See supra* note 5.

ous questions of fairness, if not due process. A lawyer convicted of the lesser offense would be automatically disbarred, without regard to facts or mitigating circumstances, whereas a lawyer convicted of the greater offense would have a chance, after a hearing, to avoid that consequence.

We have never before confronted for disciplinary purposes a criminal statute in which several subsections spell out different, related crimes but only one includes an "intent to defraud." *See In re Rosenbleet,* 592 A.2d 1036, 1037 (D.C.1991) (specific intent to defraud required for conviction under federal bank fraud statute, 18 U.S.C. § 1344, and for conviction under local second-degree fraud statute, D.C.Code § 22–3821(b)); *In re Vaccaro,* 539 A.2d 1094, 1095 (D.C.1988) (specific intent to defraud required for conviction under federal National Stolen Property Act, 18 U.S.C. § 2314); *In re Bond,* 519 A.2d 165, 166 (D.C.1986) (specific intent to defraud required under federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343); *In re Anderson,* 474 A.2d 145, 146 (D.C.1984) (specific intent to defraud required for conviction under local false pretenses statute, D.C.Code § 22–1301(a)); *In re Willcher,* 447 A.2d at 1200 (specific intent to defraud required for conviction under unlawful solicitation of money from indigent client statute, D.C.Code § 11–2606(b)). Accordingly, where only one of several related crimes in the statute—indeed, only the least serious of these crimes—involves an "intent to defraud," we believe there is a

difficult, but significant, unresolved question whether the lesser crime can inherently involve moral turpitude unless all the specified crimes also inherently involve moral turpitude (whether involving an intent to defraud or not). It may be that, on proper analysis of a presentation (not now before us) addressing the felony provisions of § 1028(a), we would conclude that they do inherently involve moral turpitude. But we need not answer such questions because of our conclusion that another analysis is dispositive here.

### B.

■ We have discovered that, with the exception of *Willcher* and this case, all "intent to defraud" adjudications in our disciplinary system have involved felonies. We recognize that misdemeanors can be "serious crimes" warranting immediate suspension pending resolution of a disciplinary proceeding[12] and that, theoretically, misdemeanors can involve moral turpitude. But we no longer see any justification for believing a misdemeanor—even one with an "intent to defraud"—can involve moral turpitude *per se.*

Our first reason for adopting this felony-misdemeanor distinction inheres in the concept of moral turpitude itself. We said in *Colson:* "If a crime is one involving moral turpitude, it is because the act denounced by the statute offends the generally accepted moral code of mankind." 412 A.2d at 1168.[13] Thus, the idea of moral turpitude incorporates a revulsion of society toward

---

12. *See* D.C.Bar R. XI § 10(b), *supra* note 2; *compare In re King,* S–46–76/R–10–77 (D.C. Nov. 18, 1976) (citing report of the Disciplinary Board, Bar Docket No. 85–76, reflecting suspension for "serious crime" of willful failure to file income tax returns in violation of 26 U.S.C. § 7203, a misdemeanor) *with In re Hutchinson,* 474 A.2d 842 (D.C.1984) (conviction of misdemeanor under 15 U.S.C. 78 ff(a) and 17 C.F.R. § 240.14e–3(d)(1), which prohibit communication of nonpublic information relating to a tender offer, not a "serious crime" requiring immediate suspension under former D.C.Bar R. XI, § 15(2), *cited with approval* in *In re Hutchison,* 534 A.2d 919, 920 (D.C.1987) (en banc)). A "serious crime" may or may not be a crime involving moral turpitude. *See In re Colson,* 412 A.2d 1160, 1182 (D.C.1979) (Ferren, J., concurring).

13. *Colson* elaborated:

> The definition of "moral turpitude" given in 2 Bouv. Law Dictionary. 2247 (Rawle's Third Revision), is as follows:
>
> An act of baseness, vileness or depravity in the private and social duties which a man owes to his fellow men or to society in general, contrary to the accepted and customary rule of right and duty between man and man. And, Black's Law Dictionary 1160 (4th ed. 1951), adds that moral turpitude is "[c]onduct contrary to justice, honesty, modesty, or good morals."

412 A.2d at 1168; *see also Willcher,* 447 A.2d at 1200.

conduct deeply offending the general moral sense of right and wrong. But if society, through its elected representatives in the legislature, has determined that particular conduct, though criminal, is not serious enough to warrant punishment beyond the misdemeanor range, we believe it is inconsistent with that judgment to hold that a statute punishing that conduct may nonetheless reflect a crime involving moral turpitude *per se*, *i.e.*, in every application, without regard to the circumstances.

The second reason why we now exclude misdemeanors from the reach of *Colson's per se* analysis lies in our own disciplinary history after *Colson*. In the twelve years since that decision, only in one case—*Willcher, see supra* note 5,—has a misdemeanor served to justify mandatory disbarment for a crime involving moral turpitude, let alone moral turpitude *per se*. In all others it has not. *See, e.g., Hutchinson*, 534 A.2d at 922–923 (misdemeanor conviction of statute and regulation prohibiting communication of nonpublic information relating to tender offer did not involve moral turpitude); *In re Kent*, 467 A.2d 982 (D.C. 1983) (misdemeanor conviction for taking property without right did not involve moral turpitude); *In re Lovendusky*, No. 84–1672 (D.C.1986) (misdemeanor conviction of attempted carnal knowledge of fourteen-year-old did not involve moral turpitude *per se* or on facts) (unpublished). Given our experience that misdemeanors, while sometimes "serious crimes," generally do not involve moral turpitude, we now conclude that the risk of permitting misdemeanors to justify automatic disbarment, without a hearing, is too great.

Finally, the crime for which McBride was convicted, 18 U.S.C. § 1028(a)(4), itself illustrates why conviction of this misdemeanor does not justify automatic disbarment. As McBride points out, the "intent to defraud" expressly made an element of this offense was intended to reach conduct well beyond the common law understanding of fraud used in *Willcher* and later cases. We have never defined "intent to defraud" for lawyer disciplinary purposes, but our disciplinary caselaw to date has concerned convictions for crimes in which the "intent to defraud" has reflected the common law definition: an intent to obtain property by a false or fraudulent pretense, representation, or promise. *See Blackledge v. United States*, 447 A.2d 46, 49 (D.C.1982); R. PERKINS & R. BOYCE, CRIMINAL LAW, at 363 (3d ed. 1982); Goldstein, *Conspiracy to Defraud the United States*, 68 YALE L.J. 405, 420 & n. 23 (1959).[14]

In contrast, § 1028(a)(4) reflects a broader definition of fraud explained by the Supreme Court years ago in *Hammerschmidt v. United States*, 265 U.S. 182, 44 S.Ct. 511, 68 L.Ed. 968 (1924), in describing the conduct punished by the predecessor of 18 U.S.C. § 371 (conspiracy to defraud the United States):

> To conspire to defraud the United States means primarily to cheat the Government out of property or money, *but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest.* It is not necessary that the Government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane or the overreaching of those charged with carrying out the governmental function.

14. Our disciplinary cases after *Willcher* have focused on statutes which, in each instance, have used language identical or similar to the definition of second-degree fraud in D.C.Code § 22-3821(b) (1989):

> engages in a scheme or systematic course of conduct with intent to defraud or to obtain property of another person by means of a false or fraudulent pretense, representation, or promise.

*See Rosenbleet*, 592 A.2d at 1037 (federal bank fraud statute, 18 U.S.C. § 1344, and local second-degree fraud statute, D.C.Code § 22-3821(b), are two offenses inherently involving moral turpitude); *In re Chuang*, 575 A.2d 725, 725–26 (D.C.App.1990) (same re wire fraud, 18 U.S.C. § 1343); *Vaccaro*, 539 A.2d at 1095 (same re National Stolen Property Act, 18 U.S.C. § 2314); *Bond*, 519 A.2d at 166 (same re mail fraud and wire fraud statutes, 18 U.S.C. §§ 1341, 1343).

*Id.* at 188, 44 S.Ct. at 512 (emphasis added); *see also Glasser v. United States,* 315 U.S. 60, 66, 62 S.Ct. 457, 463, 86 L.Ed. 680 (1942) (depriving United States "of its lawful governmental functions by dishonest means ... is a 'defrauding' within the meaning of [predecessor statute of 18 U.S.C. § 371]").

That 18 U.S.C. § 1028(a)(4) was intended to encompass this broader concept of intent to defraud is made clear in the HOUSE REPORT accompanying enactment of § 1028(a):

> The fourth offense created is the knowing possession of an identification document (other than one issued lawfully for the use of this possessor) or a false identification document, with the intent such document be used to defraud the United States.... The Committee intends that possession with the intent to commit *any offense that would be subsumed under the term "defraud the United States" would be covered.* It is the view of the Committee that the intent to defraud the United States in this context is *an intent to use the identification document to commit an offense against the United States,* for example, an offense under 18 U.S.C. 1001 [knowing false statement to governmental agency].[15] The term "defraud the United States" is not simply a misrepresentation as the term "fraud" is often defined in recent legislative proposals, *e.g.,* (H. REPORT 96–1396, 14, 141–43,[16] but would include use of false identification to obstruct functions of the government. [Footnotes omitted].

HOUSE REPORT at 11, 1982 U.S.CODE CONG. & ADMIN.NEWS at 3529 (citations omitted) (emphasis added). We do not deprecate the seriousness of this concept of fraud [17] when we point out that potentially, at least in marginal applications, it could embrace deceitful conduct bearing only an attenuated relationship to common law fraud aimed at personal gain.[18] The very expansiveness of the definition of fraud under § 1028(a)(4) may explain why Congress saw fit to classify the crime as a misdemeanor. So, too, this expansiveness reinforces the logic of our decision to limit to felonies *Colson's per se* inquiry into moral turpitude.

▮▮▮ We therefore conclude that as to all felonies—but no longer as to misdemeanors—the Board on Professional Responsibility shall initially consider, under *Colson,* whether the crime inherently in-

---

15. 18 U.S.C. § 1001 provides:

> Whoever in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

16. The House Report cited by the committee commented: "the Committee is concerned that the terms "fraud" and "defraud" have been construed so expansively by courts in recent years as to lose any clear contours[.]" H.R.REP. No. 1396, 96th Cong., 2d Sess. 14 (1980). The Report criticized the "loosely defined concept of fraud" contained in statutes that proscribe activities to "defraud the United States" as overly broad and vague and suggested specific categories of offenses to replace the concept of defrauding the United States. *See id.* at 141–42 (quoting Goldstein, *Conspiracy to Defraud the United States,* 68 YALE L.J. 405, 440–41 (1959)). Report also noted that "defrauding the United States" at one time meant depriving the Government of property or money by misrepresentation but gradually came to include interfering with any government function by dishonest means, such as misrepresentation. *See id.* at 133.

17. *See* Goldstein, 68 YALE L.J. at 434 ("To the extent that ['fraudulent'] means include[ ] falsehoods to induce action by government officials, they [fall] within the most conventional understanding of fraud").

18. For example, although prosecution might be doubtful, someone under (or over) age for the military who possesses a false identification document intending to use it to join the army out of patriotic fervor could technically violate § 1028(a)(4), as well as 18 U.S.C. § 1001. *Cf. United States v. Mamber,* 127 F.Supp. 925, 928–29 (D.Mass.1955) (Wyszanski, J.) (indictment sustained under 18 U.S.C. § 1001 for false representation on application for enlistment in Marine Corps that applicant had never been member of Communist Party, Labor Youth League, or American Youth for Democracy). And presumably someone could also violate the statute by using a false identification to purchase alcoholic beverages from a military package store. *See Brethauer v. United States,* 333 F.2d 302, 305 (8th Cir.1964).

volves moral turpitude (*i.e., per se*) or, if not, whether it involves moral turpitude on the facts. *See id.*, 412 A.2d at 1164–65. Moreover, we reaffirm our ruling in *Colson* that once this court has "made a final determination that a crime"—now limited to a felony—inherently "involves moral turpitude," *Colson*, 412 A.2d at 1165, that determination shall be applicable to future cases concerning the same felony; the moral turpitude *per se* ruling shall be consistently applied and not reexamined except by this court en banc. In this opinion, therefore, we do not disturb *Willcher's* holding to the extent that it mandates automatic disbarment, attributable to moral turpitude *per se*, for conviction of a felony involving an "intent to defraud."[19] But we do hold that in all instances where the legislature has seen fit to limit punishment for a crime to the misdemeanor range, a lawyer convicted of a misdemeanor, including one with an "intent to defraud," shall be entitled to a hearing on whether that crime, on the facts, involves moral turpitude. *See id.*

■ Further inquiry into McBride's conviction may reveal, on the facts, that his conduct did indeed involve moral turpitude; the circumstances surrounding the commission of any crime involving an intent to defraud would have to be exceptional to warrant the conclusion that moral turpitude was not involved. But we cannot find moral turpitude merely by reference to the elements of 1028(a)(4). We therefore remand the case to the Board to conduct a full hearing to "consider the circumstances of the transgression," *Colson*, 412 A.2d at 1165, and thus to determine whether McBride's particular offense involved moral turpitude. *See id.* at 1167.

### II.

### A.

■ Ordinarily this would end our analysis; we would defer reconsideration of the issue of permanency of disbarment under D.C.Code § 11–2503(a) (1989), see *supra*

note 3, until McBride or another attorney seeks reinstatement after disbarment for a crime involving moral turpitude. But in this case we believe the issue is ripe for decision.

■ An issue is ripe for review when " 'the interests of the court and the agency in postponing review until the question arises in some more concrete and final form [is] outweighed by the interests of those who seek relief from the challenged action's immediate and practical impact on them.' " *Natural Resources Defense Council, Inc., v. United States Envtl. Prot. Agency*, 273 U.S.App.D.C. 180, 190, 859 F.2d 156, 166 (1988) (quoting *Continental Air Lines, Inc. v. Civil Aeronautics Bd.*, 173 U.S.App.D.C. 1, 19, 522 F.2d 107, 125 (1974) (*en banc*)). Since at least 1982, it has been clear that some members of the Board have believed that the permanent disbarment requirement of § 11–2503(a), as interpreted in *Kerr*, creates a temptation to narrow the meaning of "moral turpitude" unduly, in order to avoid having to recommend lifetime disbarment. *See Willcher*, 447 A.2d at 1205 (Newman, C.J., concurring) (appending supplementary opinion of Lawrence J. Latto of the Board on Professional Responsibility). More recently, moreover, the Board offered a strongly held view that the "use of mandatory sanction or so called '*per se* rules' should be avoided in the disciplinary system." *In re Addams*, 579 A.2d 190, 202 (D.C.1990) (en banc) (Ferren, J., concurring in result) (quoting post-argument submission of Board on Professional Responsibility). More specifically, according to the Board:

> Using *per se* rules leads to the perception that discipline is imposed in a mechanistic or even arbitrary manner. Although predictability may be fostered by *per se* rules, this benefit is offset by a real risk of injustice when the individual circumstances of a case cannot be taken into account in imposing sanctions. This is especially so when the *per se* rule

---

**19.** In reaffirming *Willcher* to this extent, we have not had occasion to reexamine whether every sort of felony involving an "intent to de-

fraud," however defined, should be deemed an offense involving moral turpitude *per se*.

leaves no choice but to impose the ultimate sanction of disbarment.

It is often said that "hard cases make bad law." *The Board has seen evidence that, because of a perception that a determination of intentional misappropriation mandates disbarment, hearing committees may have tried to fashion their fact-findings in order to avoid this result.* Evasive action of this type is, of course, the response to be expected from tribunals bound by rules that are felt to be Draconian when applied to a "hard" case.

*Id.* (emphasis added) (footnote omitted). If the described danger to the fact-finding process occurs when mandatory disbarment is indicated, the danger is obviously all the greater when disbarment for life, *see Kerr,* 424 A.2d at 99, not for the usual five-year minimum, *see* D.C.App.R. XI, § 16(a), would be required. Accordingly, we believe these institutional concerns expressed by the Board provide a substantial reason to review the permanency issue under § 11–2503(a)—the *Kerr* decision—once again.

There is a second reason why this permanency issue is ripe for review. McBride continues to live under an order of permanent disbarment but does not know whether—in the event disbarment is sustained—he may nonetheless profit from compiling a record to justify his reinstatement by clear and convincing evidence. Many others are similarly situated. Under these circumstances, our interpretation of D.C.Code § 11–2503(a) has a "direct and immediate effect" on McBride and others in conducting their day-to-day affairs. *Natural Resources Defense Council,* 273 U.S.App. D.C. at 190, 859 F.2d at 166 (citing *Toilet Goods Ass'n, Inc. v. Gardner,* 387 U.S. 158, 164, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967)). We believe this impact on

McBride and others, coupled with the institutional concerns expressed earlier, outweighs any interest in postponing review. We therefore turn to the permanent disbarment issue.

In *Kerr,* a majority of this court interpreted language in D.C.Code § 11–2503(a)—"shall thereafter cease to be a member", see *supra* note 3—to require lifetime disbarment of attorneys convicted of crimes involving moral turpitude. *See Kerr,* 424 A.2d at 97–98. The *Kerr* majority (1) relied on New Jersey and New York cases which construed the term 'thereafter' to mean "permanent," and (2) interpreted the last sentence of § 11–2503(a)—which authorizes this court to "vacate or modify the order of disbarment" in the event of "reversal of the conviction" or of a "pardon"—to provide the only exceptions to permanent disbarment. We therefore concluded that we lacked statutory authority to reinstate a disbarred attorney who had been convicted of an offense involving moral turpitude. *See Kerr* at 98.

Although the doctrine of *stare decisis* has considerable force in statutory analysis because Congress can correct a court's interpretive mistakes through legislation, we should not "appl[y] *stare decisis* mechanically to prohibit overturning our earlier decision determining the meaning of statutes." *Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658, 695, 98 S.Ct. 2018, 2038, 56 L.Ed.2d 611 (1978). Especially in cases of attorney discipline, where Congress has given this court broad supervisory powers, *see* D.C.Code §§ 11–2501(a), –2502 (1989)—and where there are substantial institutional concerns (as described earlier) about the application of § 11–2503(a) under *Kerr*—we should not " 'place on the shoulders of Congress the burden of the Court's own error' " if indeed one has occurred.[20] *Monell,* 436 U.S. at

---

**20.** Because the Board on Professional Responsibility and this court have broad supervisory powers over attorney discipline, our joint function is similar to that of an administrative agency construing its enabling statute. Although this analogy is far from perfect, we believe we should be prepared in disciplinary cases, more readily than in other types of proceedings, to re-

examine in light of our experience whether prior interpretations accord with legislative intent. *Cf. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 863–64, 104 S.Ct. 2778, 2792, 81 L.Ed.2d 694 (1984) (initial agency interpretation "not instantly carved in stone"; rather, "to engage in informed rule making [agency] must consider varying inter-

695, 98 S.Ct. at 2038 (quoting *Girouard v. United States,* 328 U.S. 61, 70, 66 S.Ct. 826, 830, 90 L.Ed. 1084 (1946)). Even though proposals to repeal § 11–2503(a) have been submitted over the years to Congress by the Council for Court Excellence, congressional inaction should not be our guide.

> It would require very persuasive circumstances enveloping Congressional silence to debar this Court from re-examining its own doctrines.... Various considerations of parliamentary tactics and strategy might be suggested as reasons for the inaction of ... Congress, but they would only be sufficient to indicate that we walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle.

*Helvering v. Hallock,* 309 U.S. 106, 119, 121, 60 S.Ct. 444, 451, 452, 84 L.Ed. 604 (1940). Finally, we note that the *Kerr* majority did not deal with legislative history (and related caselaw) underlying § 11–2503(a). Given the ambiguity of the statute, this history deserves careful attention. *See Peoples Drug Stores v. District of Columbia,* 470 A.2d 751, 754 (D.C.1983) (en banc). We therefore revisit *Kerr* and D.C.Code § 11–2503(a), *supra* note 3.

### B.

Initially, we note that conceptually, disbarment and reinstatement pose separate questions. Disbarment, as such, speaks solely to one's exit from the profession; it does not, in itself, preclude reinstatement, either absolutely or presumptively. Put another way, reinstatement "is not a continuation of the prior [disbarment] proceeding"; it "is a new proceeding for admission to the bar." *In re Keenan,* 310 Mass. 166, 168, 37 N.E.2d 516, 519 (1941).

This jurisdiction has recognized the inherent separateness of disbarment and reinstatement for over 70 years. *See In re Adriaans,* 33 App.D.C. 203 (1909) (reinstatement nine years after disbarment); *accord, Ex Parte Peters,* 195 Ala. 67, 70 So. 648 (1916); *In re Lavine,* 2 Cal.2d 324, 41 P.2d 161 (1935); *Cantor v. Grievance Committees,* 189 Tenn. 536, 226 S.W.2d 283 (1949).

This is not to say disbarment has no bearing on one's prospects for reinstatement. It obviously does. The point, rather, is that the implication of the one for the other in individual cases (or in categories of cases) is a matter of statute, rule, and/or court decision.[1] The nexus must be affirmatively established.

The question, then, is whether Congress not only mandated disbarment for conviction of an offense involving moral turpitude, *In re Colson,* D.C.App. 412 A.2d 1160 (1979), but, as an added sanction, precluded reinstatement.

---

[1] *Compare Levenson v. Mills,* 294 F.2d 397, 399 (1st Cir.1961), *cert. denied,* 368 U.S. 954, 82 S.Ct. 397, 7 L.Ed.2d 387 (1962) ("although the [disbarment] order is permanent in form it does not necessarily prevent the appellant from reinstatement"); *In re Spriggs,* 90 Ariz. 387, 388, 368 P.2d 456, 457 (1962) ("the law does not intend that disbarred members remain out of their profession indefinitely if the disbarred member has rehabilitated himself in society and has shown himself to be a person of good moral character"); *Florida Bar v. Whiting,* 157 So.2d 690 (Fla.1963) (unqualified judgment of disbarment does not preclude an attorney from ever seeking reinstatement); *In re Hiss,* 368 Mass. 447, 333 N.E.2d 429, 434 (1975) ("Disbarment is not a permanent punishment imposed on delinquent attorneys as a supplement to the sanctions of the criminal law.... Such a harsh, unforgiving position is foreign to our system of reasonable, merciful justice.") *with People v. Buckles,* 167 Colo. 64, 453 P.2d 404, 405 (1968) (en banc) (statute mandating disbarment for felony conviction also precludes reinstatement); *In re Sugarman,* 64 App.Div.2d 166, 409 N.Y.S.2d 224 (1978) (same).

*Kerr,* 424 A.2d at 99–100 (Ferren, J., dissenting).

 In construing an act of Congress, "we must look first to the language of the statute and, if it is clear and unambiguous, give effect to its plain meaning." *Office of People's Counsel v. Public Service Comm'n,* 477 A.2d 1079, 1083 (D.C. 1984). The *Kerr* majority concluded that the critical phrase—"shall thereafter cease to be member"—meant the lawyer must be disbarred forever. The word "thereafter,"

---

pretations and the wisdom of its policy on a continuing basis").

however, may be read literally in more than one way. It may connote indefiniteness,[21] *see Kerr*, 424 A.2d at 101 (Ferren, J., dissenting), as well as permanence. Accordingly, we must examine the legislative history of § 11–2503(a) to ascertain, if possible, how Congress defined "thereafter."

There has been remarkably little change over the years in the statutes dealing with attorney discipline in the District of Columbia. The first disciplinary statute appeared in 1901; it is the root of § 11–2503. The 1901 statute conferred discretionary power on the court to disbar attorneys convicted of offenses involving moral turpitude:

> Sec. 220. Each of the courts in said District *may* suspend or dismiss from its bar any attorney who shall be convicted of any offense involving moral turpitude.

Act to Establish a Code of Law for the District of Columbia, Ch. 854, 31 Stat. 1189, 1224 (1901) (emphasis added). Section 218 of this act gave the Supreme Court of the District of Columbia "full power and authority, from time to time, to make such rules as it may deem proper respecting the qualifications, examinations, and admission of attorneys to practice ..." *Id.* at 1224.

In 1920, Congress added section 219a. It replaced former section 220[22] and, for the first time, included language specifically permitting the court, in its discretion, to order the name of an attorney convicted of an offense involving moral turpitude to be "stricken from the roll" so that "he [or she] shall thereafter cease to be a member." Section 219a provided in full:

> Sec. 219a. Whenever any member of the bar of said court shall be convicted of any offense involving moral turpitude,

and a duly certified copy of the final judgment of such conviction shall be presented to said court, the name of the member so convicted *may* thereupon, by order of said court, be stricken from the roll of the members of said bar, and he shall thereafter cease to be a member thereof. In the event of appeal from any such judgment of conviction as aforesaid, and pending the final determination of such appeal, the said court may order the suspension from practice of such convicted member of the bar and upon a reversal of such conviction, or the granting of a pardon, said court shall have power to vacate or modify such order of disbarment or suspension.

Pub.L. No. 66–181, 41 Stat. 555, 561 (1920) (emphasis added). Like its predecessor, a new section 218 in the 1920 Act continued to give the court full power to make rules regarding the qualifications and admissions of attorneys to the practice of law.

The legislative history of section 219a is noticeably sparse[23] and does not explain the meaning of the phrase "shall thereafter cease to be a member." However, the phrase "his name [shall] be stricken from the roll of attorneys" does appear—well before enactment of the 1920 statute—in a 1900 case ordering disbarment of an attorney for his conviction for maliciously trespassing, stealing, and libeling the United States District Attorney. *See In re Adriaans*, 17 App.D.C. 39, 51 (1900). Nine years later, the court granted Adriaans' petition for readmission to the bar because "[t]he punishment for the single offense committed seems ample under all the cir-

---

**21.** "Thereafter" may be defined as "[a]fter the time last mentioned; after that; after that time; afterward; subsequently; thenceforth." BLACK's LAW DICTIONARY 1478 (6th ed. 1990). According to Webster, "thereafter" means "after that; ... from then on." WEBSTER's THIRD NEW INTERNATIONAL DICTIONARY 2372 (1969).

**22.** New section 220 of the 1920 Act permitted the court to suspend attorneys from the practice of law at any time after disciplinary charges had been filed. See 41 Stat. at 561.

**23.** In one set of House hearings held in 1916, members testified that the intent of the provision was "to make the record of the conviction

work automatically" so that the court would have the power to disbar on the basis of the conviction alone, although the conviction need not compel disbarment. To Amend the Code of the District of Columbia, Hearings on H.R. 14974 Before the House Comm. on the Judiciary, 64th Cong., 1st Sess. 63 (1916). The Committee also explained that a pardon would not automatically reverse any disbarment; rather, the decision to reinstate after a pardon remained with the court. *Id.* at 65. The Hearings, however, made no reference to whether anyone envisioned disbarment as a permanent condition. *Id.*

cumstances." *In re Adriaans*, 33 App. D.C. 203, 205 (1909). It would appear, therefore, that at the time Congress adopted the 1920 Act, Congress knew, or should have known, that the court had reinstated a lawyer convicted of a crime involving moral turpitude. "Ordinarily, Congress may be presumed to know the construction which has been given to prior statutory provisions, and to know their history, when it incorporates them in later legislation." *Office of People's Counsel*, 477 A.2d at 1091. Presumably, therefore, if Congress had intended to remove such power from the court—and thus to deny the power to grant petitions for readmission by imposing on District lawyers a new, more restrictive sanction of permanent disbarment—Congress would have done so in clearer, more explicit language.[24]

In 1963, Congress essentially reenacted the 1920 act while updating some of its language, but it kept the relevant phrases: "may ... be struck from the roll of members of the bar" and "shall thereafter cease to be a member thereof." The new legislation provided:

§ 11–2103. Disbarment by District Court upon conviction of crime

When a member of the bar of the United States District Court for the District of Columbia is convicted of an offense involving moral turpitude, and a duly certified copy of the final judgment of the convictions presented to the court, the name of the member so convicted *may* thereupon, by order of the court, be struck from the roll of the members of the bar, and he shall thereafter cease to be member thereof. Upon appeal from a

judgment of conviction, and pending the final determination of the appeal, the court may order the suspension from practice of the convicted member of the bar; and upon a reversal of the conviction, or the granting of a pardon, the court may vacate or modify the order of disbarment or suspension.

Judiciary and Judicial Procedure Act, Pub.L. No. 88–241, 77 Stat. 478, 505 (1963) (codified as amended at D.C.Code § 11–2103 (1967)) (emphasis added). Again, the legislative history on this section is sparse, and it is altogether unhelpful. *See, e.g.,* S.REP. No. 743, 88th Cong., 1st Sess. 55 (1963) (no discussion); H.R.REP. No. 377, 88 Cong., 1st Sess. 47 (1963) (no discussion).[25] It would not make sense to conclude, however, that Congress once again gave the court the flexibility to decide whether to disbar for an offense involving moral turpitude but failed to give the court the additional power it had always exercised to consider reinstatement at a later date. Although conceptually possible, a rule permitting discretionary disbarment, but mandating lifetime disbarment if that discretion is exercised, would have been anomalous to say the least. We find no evidence that Congress took that position.[26]

We come now to the 1970 Act, which worked the first major substantive change in the law of lawyer discipline in fifty years. Congress made disbarment mandatory, no longer permissive, upon conviction of an offense involving moral turpitude and for the first time required, not merely permitted, the suspension of attorneys while their convictions were on appeal. *See* District of Columbia Court Reform and Crimi-

**24.** We also note that when Congress adopted the 1920 disciplinary act, disbarment was not a permanent disability under the rule prevailing nationally. *See* Annotation, *Reinstatement of Attorney after Disbarment, Suspension, or Resignation,* 70 A.L.R.2d 268, 276–77 (1960).

**25.** The SENATE REPORT explained that the purpose of the act was simply "to revise, codify and enact" part of the D.C.Code. S.REP. No. 743, 88th Cong., 1st Sess. 4 (1963). "Revision, as distinguished from simple codification, means the substitution of plain language for awkward terms ..." *Id.*

**26.** We also note that in 1957, an attorney convicted of forgery who was subsequently disbarred asked the court to rescind the order of disbarment. Although the court refused his request, it never suggested that it lacked the power to grant it. See *In re Williams*, 158 F.Supp. 279 (D.D.C.1957), *aff'd*, 256 F.2d 888 (1958). By reenacting essentially the same statutory language in 1963 that governed the *Williams* decision of 1957, Congress apparently intended not to change the court's presumed power to reinstate, at its discretion, an attorney stricken from the roll for a crime involving moral turpitude. *See Office of People's Counsel*, 477 A.2d at 1091.

**640**

nal Procedure Act of 1970, Pub.L. No. 91–358, 84 Stat. 473, 521 (1970). The 1970 act is now codified in D.C.Code § 11–2503, see *supra* note 3. Nothing in the legislative history, however, indicates that Congress intended to make this new mandatory disbarment permanent. There was no discussion of the meaning of "shall thereafter cease to be a member." *See, e.g.,* S.REP. No. 405, 91st Cong., 1st Sess. 34 (1969) (no discussion); H.R.REP. No. 907, 91st Cong., 2d Sess. 148 (1969) (discussing automatic suspension provision only); H.R.CONF.REP. No. 1303, 91st Cong., 2d Sess. 225–26 (1970) (discussing automatic suspension provision only).

### C.

██ The *Kerr* majority was unmoved by the apparently more limited statutory history presented to the court and thus relied heavily on the express language in § 11–2503(a) that, "[u]pon the granting of a pardon to a member so convicted [of an offense involving moral turpitude], the court may vacate or modify the order of disbarment." The *Kerr* majority stressed: "our statute expressly provides for only one situation in which a disbarment order may be modified or vacated, namely, in the event of a pardon." *Kerr,* 424 A.2d at 98.

The language pertaining to a pardon first appeared in § 219a of the 1920 Act and has been carried forward in § 11–2103 of the 1963 Act and in § 11–2503(a) of the 1970 Act currently in effect. Thus, for the *Kerr* majority to be correct, we would have to conclude that Congress has long intended permanent disbarment for conviction of a crime involving moral turpitude, even at a time when Congress plainly intended disbarment itself for such a conviction to be a matter of court discretion—a position we have already called untenable as a matter of common sense (although conceptually possible). In any event, there are other reasons why the express exception for a pardon should not be deemed an exclusive route to reinstatement.

The *Kerr* majority's conclusion that the pardon exception under § 11–2503 provides the exclusive basis for resumption of prac-

tice overlooks and confuses the inherent separateness of disbarment and reinstatement.

Vacation or modification of an order of disbarment is not legally equivalent to an order of reinstatement. Rather, such an action is, in effect, a ruling that the original order of disbarment is void from the beginning and therefore must be erased or supplanted. That ruling does not represent a conclusion that an individual had violated a disciplinary rule but now is rehabilitated, which is the relevant concern when reinstatement is at issue. *See* D.C.App.R. XI, § 21(5). By interpreting the statute to mean that authority to "vacate or modify" provides the only avenue to "reinstatement," the [*Kerr*] majority strain[ed] to make these concepts congruent when they more properly should be said to exist side-by-side.

Even if vacation or modification of disbarment could be deemed a legal, as well as functional, equivalent of reinstatement, each would comprise only a subset of this broader concept of reinstatement. Pardon and reversal of a conviction are such obvious, categorical bases for restoration of an attorney disbarred for a crime that the disbarment provision itself would appear unfair on its face (or at least to have a material omission in drafting) if these avenues of relief were not expressly recognized.

*Kerr,* 424 A.2d at 101 (Ferren, J., dissenting) (footnote omitted). Accordingly, we decline to inflate the "vacation" or "modification" concepts to fill the entire space occupied by "reinstatement," in order to achieve the severest possible interpretation. We conclude that the "pardon" exception does not undermine our analysis that Congress should not be understood to have mandated lifelong disbarment under § 11–2503(a).

██ However, we are still left with the ambiguity of the word "thereafter" used in D.C.Code § 11–2103(a). Given that ambiguity, the inconclusiveness of the legislative history, the substantial precedent at the time of the 1970 Act permitting rein-

statement upon rehabilitation after a period of disbarment, and the serious deprivation of the right to earn a particular livelihood caused by disbarment, we resolve the ambiguity in § 11–2503(a) by reference to the tradition against mandatory, perpetual disbarment and, by analogy, to the rule of lenity applicable in criminal cases. "When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity." *Bell v. United States,* 349 U.S. 81, 83, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955). Whereas § 11–2503(a) is clear as to mandatory disbarment, it cannot be said with assurance that the statute makes disbarment permanent.

We therefore conclude that all attorneys disbarred upon conviction of a crime involving moral turpitude shall no longer be deemed disbarred for life under D.C.Code § 11–2503(a) and that such attorneys, like all others who have been disbarred, shall be entitled to petition for reinstatement, pursuant to D.C.App.R. XI § 16(a), after five years of disbarment. *In re Kerr,* therefore, is overruled.

### III.

We remand the case for the Board to consider whether, on the facts, McBride's conviction under 18 U.S.C. §§ 1028(a)(4) and (b)(3) (1988) involves moral turpitude. In addition, *Kerr* is overruled; an attorney disbarred under D.C.Code § 11–2503(a) shall no longer be deemed disbarred for life.

*Case remanded.*